## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA      :
                                 :
         v.                        :      CRIMINAL NO. 12-239-1
                                   :
FRANK G. McALEESE            :
         a/k/a "Frank George McAleese"    :
         a/k/a "Frank E. MacLaine"       :
         a/k/a "Frank Eastwood MacLaine   :


### <u>O R D E R</u>


**AND NOW**, this        day of              , 2012, upon consideration of the

Defendant's Motion to Suppress Physical Evidence, and the government's response thereto, it is

hereby **ORDERED** that the Motion is **GRANTED**.

The direct and indirect proceeds of the searches of the defendant's residence and cellular

telephones pursuant to defective and invalid warrants, as detailed in defendant's Motion and

supporting Memorandum of Law, are hereby **SUPPRESSED**.  Such evidence shall be

inadmissible at trial.

It is so **ORDERED**.


BY THE COURT:


_____
**THE HONORABLE MITCHELL S. GOLDBERG**
**United States District Court Judge**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO.  12-239-1 |
| | : | |
| FRANK G. McALEESE | : | |
|     a/k/a "Frank George McAleese | : | |
|     a/k/a "Frank E. MacLaine" | : | |
|     a/k/a "Frank Eastwood MacLaine | : | |


## DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE

For the reasons set forth in the accompanying Memorandum of Law, Frank McAleese, by

and through his undersigned counsel, moves the Court to suppress the proceeds of the search of a

Samsung "Jitterbug" cellular telephone and a Samsung "Cricket" cellular telephone; as well as

the proceeds of a search of Apartment C-21 located at 615 East Main Street in Maple Shade,

New Jersey.  The affidavits supporting the search warrants at issue completely failed to set forth

facts sufficient to establish probable cause for the lawful issuance of the warrants.  Furthermore,

as it pertains to the search warrant for the cellular phones, the scope of the search requested and

approved was overbroad.  The direct and indirect proceeds of the searches must, therefore, be

suppressed as fruit of the poisonous tree.


Respectfully submitted,


/s/ *James J. McHugh, Jr.*
JAMES J. MCHUGH, JR.
Assistant Federal Defender

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO. 12-239-1** |
| | : | |
| **FRANK G. McALEESE** | : | |
| **a/k/a "Frank George McAleese** | : | |
| **a/k/a "Frank E. MacLaine"** | : | |
| **a/k/a "Frank Eastwood MacLaine** | : | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE**

Defendant, Frank G. McAleese, is charged in a ten-count Indictment with: providing false information to a federal firearms licensee, in violation of 18 U.S.C. § 922(a)(6) (Counts One, Five and Eight); making a false statement to a federal firearms licensee, in violation of 18 U.S.C. § 924(a)(1)(A) (Counts Two, Six and Nine); and, possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) (Counts Three, Four, Seven and Ten).

The charges in the Indictment arise from evidence seized during the search of a Samsung "Jitterbug" cellular telephone and a Samsung "Cricket" cellular telephone. The charges in the Indictment also arise from physical evidence seized during the search of Mr. McAleese's residence at 615 East Main Street, Apartment C-21, in Maple Shade, New Jersey. The charges in the Indictment also arise from photographic identifications of the defendant made as a direct result of the evidence seized during the illegal search of the phones and the residence.

When officers with the New Jersey State Police searched the cellular telephones and defendant's residence, they did so pursuant to invalid warrants. With respect to the residence,

the affidavit in support of the search warrant[1] sworn out by Detective II D. Quinn, was invalid, inter alia, because the affidavit of probable cause did not establish any nexus between the murder and the place to be searched and did not contain any dates whatsoever for the murder or for any of the events alleged therein.

The affidavit in support of the search warrant for the phones,[2] which was also prepared by Detective Quinn, was also invalid because, inter alia, it too did not contain any dates whatsoever for the murder or for any of the events alleged therein; it was vague, and it was overly broad in the scope of the search requested and approved.  Simply put, it too failed to be supported by an affidavit of probable cause that alleged facts that established anything –  let alone probable cause.

Both of these warrants therefore were invalid.  Moreover, no reasonable officer would have relied on such bare bone affidavits, and therefore the officers were not entitled to rely on the warrants in good faith.  United States v. Leon, 468 U.S. 897, 922 (1984).  For the reasons set forth below, the evidence – direct and indirect – resulting from both searches must be suppressed.  See Wong Sun v. United States, 371 U.S. 471, 486 (1963); Mapp v. United States, 367 U.S. 643, 655 (1961).

I.      **THE FACTUAL AND PROCEDURAL HISTORY**

On or about November 10, 2011, Mr. McAleese was arrested in Salem County, New Jersey for the murder of Carole Brown.  Following Mr. McAleese's arrest, Detective Quinn obtained warrants to search two cellular telephones and defendant's residence for evidence

---

[1]  Search Warrant and Application for Search Warrant pertaining to Apartment C-21 at 615 East Main Street, Maple Shade, New Jersey, attached hereto as Exhibit "A".

[2]  Search Warrant and Application for Search Warrant pertaining to Cellular Telephones attached hereto as Exhibit "B."

relating to Ms. Brown's murder.

Specifically, on November 15, 2011, he averred in the affidavit of probable cause in support of the search warrant for the Samsung "Jitterbug" and "Cricket" cellular telephones:

A.      . . . Frank Maclaine drove Carole Brown to the hospital, operating Carole Brown's vehicle (2006 Hyundai Tucson, bearing Pennsylvania registration YHH13B).  Carole Brown had severe blunt force trauma to the back side of her head.  Carole Brown . . . was pronounced deceased at 11:25 P.M.

B.      . . . Trooper Bobbitt encountered Frank Maclaine sitting in a wheelchair in the hallway of the Emergency Room.  Frank Maclaine told Trooper Bobbitt that he was visiting his girlfriend, Carole Brown, at her apartment.  At some point in the evening, Carole Brown drove to the "Corner Bar" in Woodstown to "buy drugs".  When she didn't return after an hour, Frank Maclaine claimed that he walked to the "Corner Bar" to look for her and observed her vehicle parked in the "Corner Bar" parking lot.  Frank Maclaine indicated that he saw Carole Brown slumped over, sitting in the passenger seat of the vehicle.  He opened the passenger door, shook Carole, and asked her "if she was okay".  Carole did not respond.  Frank Maclaine indicated that he assumed control of the vehicle and drove her to the Salem County Hospital.

C.      Detective II E. Crain . . . of the New Jersey Police/Crime Scene Unit, responded to the hospital and photographed Carole Brown's Hyundai Tucson.  In plain view, through the vehicle's window, Detective Crain observed evidence of an assault.  Located throughout the passenger cabin was pools of blood, high velocity blood spatter, brain matter, and bone fragments.  Consequently, the vehicle was secured and towed to Troop "A" Headquarters, pending the application of a search warrant.

D.      Detective II D. Quinn . . . responded the Carole Brown's apartment (160 West Avenue, Apartment E 714, Woodstown, New Jersey).  Frank Maclaine's vehicle (Ford Taurus, PA Registration HSL2233) was parked haphazardly in a parking stall in front of her apartment.  The vehicle had impact damage, which appeared to have been recent, to the lower portion of the vehicle's passenger door.

E.      During a neighborhood canvass, Trooper B. Guinup . . . interviewed Carole Brown's neighbor (Anna G. Pansena . . .160 West Avenue, Apartment 715 . . .).  Anna Pansena stated the Frank Maclaine is a long time "good friend" of Carole Brown.  Anna recalled going to bed at

approximately 10:15 P.M.  Before doing so, Anna heard Carole "talking loud" at the rear of her vehicle, which was very uncharacteristic of Carole. . . . Anna assumed Carole was speaking to Frank Maclaine, but was not certain.  A few minutes after hearing the loud conversation, Anna looked outside of her window a second time and noticed Carole's vehicle was no longer there.  Only Frank MacClaine's vehicle remained.  Frank Maclaine's vehicle (2005 Ford Taurus . . .) was secured and towed to Troop "A" Headquarters, pending the application of a search warrant.

F.    I telephoned Carole Brown's next of kin, and ex-husband, George Brown Jr. . . George Brown explained that he and Carole have been divorced for approximately 25 years.  George indicated that he does not stay intimately involved in her daily life, but they remain in sporadic contact.  They last spoke approximately one month ago.  In regards to past or recent boyfriends, George stated that Carole had a relationship with a guy name "Frank" intermittently over the last 20 years.  George could not independently recall "Frank's" last name, but when offered the last name "Maclaine", George stated, "yeah, that's it".  George added that Carole has complained in the past that Frank was stalking her and that she (Carole) was afraid of him (Frank).  George believed that Frank was attempted to reignite a relationship with Carole, however, she was not interested.

G.    Frank Maclaine was transported to the Woodstown Station for further investigation.  Frank Maclaine's clothes were covered in blood.  Permeated throughout his jacket, shirt, pants, and boots were smears and droplets of blood.  Frank Maclaine's hands were blood soaked, and blood spatter was observed on his face and forehead.  At the time Frank Maclaine was transported the Woodstown Station, he was extremely intoxicated and not suited for an interview.

H.    When Frank Maclaine was placed under arrest, he was found to possess the aforementioned Samsung "Jitterbug" cellular telephone (MODEL SPT-A310, Bearing Serial Number 268435458905807471).  During the execution of the search warrant on the vehicle whereupon the crime was committed (2006 Hyundai Tucson, bearing New Jersey Registration YHH13B, and Vehicle Identification Number KM8JM 12B86 U2528 78), a Samsung "Cricket" Cellular Telephone, Model SCH-R211, bearing serial number 268435459000212693 was located therein.

Exhibit "B," Application for Search Warrant, ¶ 5, pgs. 3-5 of 6.

As this Court can clearly see, there are no facts averred connecting the cellular telephones

and the murder of Ms. Brown.  Furthermore, there are no dates listed for the murder or for any of

the events described in the affidavit.  Rather, Detective Quinn baldly concluded that he had

"reason to believe and [did] believe that evidence relating to the crime of Murder . . ., Possession

of a Weapon for an Unlawful Purpose . . ., Possession of CDS/Heroin . . ., and Possession of

CDS Paraphernalia . . ., is located upon the 1) Samsung "Jitterbug" Cellular Telephone . . . and

Samsung "Cricket" Cellular Telephone . . . ."  Id. at p. 6 of 6.

In both the warrant and the affidavit, Detective Quinn sought authority to search the

cellular telephones for:

> All information stored in the telephone, including but not limited to,
> assigned mobile telephone number, Electronic Serial Number (ESN),
> International Mobile Equipment Identifier (IMEI) number, Internation
> Mobile Subscriber Identity (IMSI) number, serial number, service
> provider, stored list of all incoming telephone calls, all outgoing
> telephone calls, stored contact lists, any other evidence or information
> tending to establish the commission of the crimes of Murder . . .,
> Possession of a Weapon for an Unlawful Purpose . . ., *Possession of
> CDS/Heroin . . ., and Possession of CDS Paraphernalia . . . .*

Exhibit "B," Search Warrant, ¶ 1, pgs. 1-2 of 3; Application for Search Warrant, ¶ 4, pgs. 2-3 of

6.

Detective I Harold McDermott performed a physical review of the cellular telephones.

Detective McDermott allegedly discovered a telephone number for "Lock's" stored within the

contacts section of the Samsung "Cricket" cellular telephone.  Further investigation by Detective

McDermott revealed that "Lock's" was short for Lock's Philadelphia Gun Exchange, which is

located at 6700 Rowland Avenue in Philadelphia, Pennsylvania.

Thereafter, on November 17, 2011, Detective Quinn sought and was issued a warrant to

search Mr. McAleese's residence at 615 East Main Street, Apartment C-21, Maple Shade, New

Jersey.  Maple Shade is approximately 35 miles from Woodstown – in a different County.  In

support of the application for the warrant Detective Quinn averred in the affidavit of probable

cause:

A.  . . . Frank Maclaine drove Carole Brown to the hospital, operating Carole Brown's vehicle (2006 Hyundai Tucson, bearing Pennsylvania registration YHH13B).  Carole Brown had severe blunt force trauma to the back side of her head.  Carole Brown . . . was pronounced deceased at 11:25 P.M.

B.  . . . Trooper Bobbitt encountered Frank Maclaine sitting in a wheelchair in the hallway of the Emergency Room.  Frank Maclaine told Trooper Bobbitt that he was visiting his girlfriend, Carole Brown, at her apartment.  At some point in the evening, Carole Brown drove to the "Corner Bar" in Woodstown to "buy drugs".  When she didn't return after an hour, Frank Maclaine claimed that he walked to the "Corner Bar" to look for her and observed her vehicle parked in the "Corner Bar" parking lot.  Frank Maclaine indicated that he saw Carole Brown slumped over, sitting in the passenger seat of the vehicle.  He opened the passenger door, shook Carole, and asked her "if she was okay".  Carole did not respond.  Frank Maclaine indicated that he assumed control of the vehicle and drove her to the Salem County Hospital.

C.  Detective II E. Crain . . . of the New Jersey Police/Crime Scene Unit, responded to the hospital and photographed Carole Brown's Hyundai Tucson.  In plain view, through the vehicle's window, Detective Crain observed evidence of an assault.  Located throughout the passenger cabin was pools of blood, high velocity blood spatter, brain matter, and bone fragments.  Consequently, the vehicle was secured and towed to Troop "A" Headquarters, pending the application of a search warrant.

D.  Detective II D. Quinn . . . responded the Carole Brown's apartment (160 West Avenue, Apartment E 714, Woodstown, New Jersey).  Frank Maclaine's vehicle (Ford Taurus, PA Registration HSL2233) was parked haphazardly in a parking stall in front of her apartment.  The vehicle had impact damage, which appeared to have been recent, to the lower portion of the vehicle's passenger door.

E.  During a neighborhood canvass, Trooper B. Guinup . . . interviewed Carole Brown's neighbor (Anna G. Pansena . . .160 West Avenue, Apartment 715 . . .).  Anna Pansena stated the Frank Maclaine is a long time "good friend" of Carole Brown.  Anna recalled going to bed at

approximately 10:15 P.M.  Before doing so, Anna heard Carole "talking loud" at the rear of her vehicle, which was very uncharacteristic of Carole. . . . Anna assumed Carole was speaking to Frank Maclaine, but was not certain.  A few minutes after hearing the loud conversation, Anna looked outside of her window a second time and noticed Carole's vehicle was no longer there.  Only Frank MacClaine's vehicle remained.  Frank Maclaine's vehicle (2005 Ford Taurus . . .) was secured and towed to Troop "A" Headquarters, pending the application of a search warrant.

F.     I telephoned Carole Brown's next of kin, and ex-husband, George Brown Jr. . . George Brown explained that he and Carole have been divorced for approximately 25 years.  George indicated that he does not stay intimately involved in her daily life, but they remain in sporadic contact.  They last spoke approximately one month ago.  In regards to past or recent boyfriends, George stated that Carole had a relationship with a guy name "Frank" intermittently over the last 20 years.  George could not independently recall "Frank's" last name, but when offered the last name "Maclaine", George stated, "yeah, that's it".  George added that Carole has complained in the past that Frank was stalking her and that she (Carole) was afraid of him (Frank).  George believed that Frank was attempted to reignite a relationship with Carole, however, she was not interested.

G.     Frank Maclaine was transported to the Woodstown Station for further investigation.  Frank Maclaine's clothes were covered in blood.  Permeated throughout his jacket, shirt, pants, and boots were smears and droplets of blood.  Frank Maclaine's hands were blood soaked, and blood spatter was observed on his face and forehead.  At the time Frank Maclaine was transported the Woodstown Station, he was extremely intoxicated and not suited for an interview.

H.     Frank Maclaine was later formally interview and charged.  During the interview process, Mr. Maclaine advised that he currently resides at 615 East Main Street, Apt. C-21, Block 85, Lot # 2, Maple Shade, New Jersey 08052.

I.     On November 16th 2011, I received a phone call from George Brown III, the son of Carole Brown, who advised that while searching his mother's residence he discovered a life insurance policy in his mother's name with Mutual Insurance of Omaha for $25,000.00.  The policy was taken out in July 2011 with Frank Maclaine listed as the beneficiary.  Mr. Brown felt after looking at the signature on the paperwork it was not his mothers.  Mr. Brown believes that the signature on the insurance paperwork may have been forged.

Exhibit "A," <u>Application for Search Warrant</u>, ¶ 5, pgs. 4-8 of 9.

Here again, no dates were given for the murder or for any of the events described in the affidavit.  Furthermore, the affidavit was devoid of any information linking any facts of the murder to McAleese's residence.  Detective Quinn, nevertheless, baldly stated that he had reason to believe that evidence of murder, possession of a weapon, possession of heroin and possession of drug paraphernalia would be found in the residence.  <u>Id.</u> at p.8 of 9.

In the warrant, Detective Quinn sought to search Mr. McAleese's residence for:

Evidence relating to the offenses of, Murder . . . Aggravated Assault . . . and Possession of Weapon for Unlawful Purpose . . . .

Exhibit "A," <u>Search Warrant</u>, ¶ 1, pgs. 1-2 of 3.

Detective Quinn and the other officers executing the warrant at the residence seized gun store receipts indicating the possible purchase and subsequent return of firearms by the defendant.

 In March 2012, the New Jersey State Police provided the ATF with the evidence it had recovered from the cellular telephones and defendant's home pertaining to possible federal firearm violations committed by Mr. McAleese.  The government used this illegally seized evidence to conduct interviews and to obtain photographic identifications of defendant.  The evidence seized during the illegal search of the residence and the phones must be suppressed.  Furthermore, the out-of-court photographic identifications of the defendant and any future in-court identifications must also be suppressed as they are direct fruits of this illegal search.

On May 15, 2012, the government charged Mr. McAleese with the conduct alleged in the instant Indictment.  As set forth in detail below, the searches and seizures that occurred here

violated Mr. McAleese's Fourth Amendment rights.  The affidavits submitted in support of the

search warrants contained insufficient information to believe that the cellular telephones and his

residence contained evidence relating to the murder of Carole Brown.  The requested scope of the

search warrant for the cellular phones that was eventually approved was overly broad – rendering

the warrants invalid.  The evidence – direct and indirect – recovered and resulting from both

searches must, therefore, be suppressed.

## II.    DISCUSSION

### A.    The Affidavit of Probable Cause Failed to Establish Any Proximate or Temporal Nexus Between Defendant's Residence and the Murder

The Fourth Amendment to the United States Constitution states:

> The right of the people to be secure in their persons, houses, papers,
> and effects, against unreasonable searches and seizure, shall not
> be violated, and no Warrants shall issue, but upon probable cause,
> supported by Oath or affirmation, and particularly describing the
> place to be searched, and the persons or things to be seized.

U.S. Const. Amend IV.

"One's home is sacrosanct, and unreasonable government intrusion into the home is 'the

chief evil against which the wording of the Fourth Amendment is directed.'" United States v.

Zimmerman, 277 F.3d 426, 431 (3d Cir. 2002) (quoting inter alia, Payton v. New York, 445 U.S.

573, 585 (1980)).  A search warrant may issue only if a neutral magistrate determines that there is

a "'fair probability that . . . evidence of a crime will be found in a particular place.'" Id. at 432

(quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)); Jones v. United States, 362 U.S. 257, 271

(1960)).  Thus, "residential searches have been upheld only where some information links the

criminal activity to the defendant's residence." United States v. Lalor, 996 F.2d 1578, 1583 (4th

11

Cir.), cert. denied, 510 U.S. 983 (1993).

To meet the probable cause standard, "there must, of course, be a nexus . . . between the item to be seized and criminal behavior." Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 307 (1967). To sanction a warrant without such a nexus "would be to invite general warrants authorizing searches of any property owned, rented, or otherwise used by a criminal suspect – just the type of broad warrant the Fourth Amendment was designed to foreclose." United States v. Schultz, 14 F.3d 1093, 1098 (6th Cir. 1994) (emphasis in original).

The best evidence supporting such nexus is some piece of information showing a direct connection between the item and the place. See e.g., United States v. Jones, 994 F.2d 1051, 1056 (3d Cir. 1993) ("ideally every affidavit would contain direct evidence linking the place to be searched to the crime"). In the absence of direct evidence linking the items sought to the place to be searched, there must at minimum be sufficient specific information from which a reasonable inference can be drawn that the items are likely to be found in that place. "Probable cause can be . . . inferred by considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide stolen property.'" Id. (quoting United States v. Jackson, 756 F.2d 703, 705 (9th Cir. 1985) (quoted in United States v. Hodge, 246 F.3d 301, 305 (3d Cir. 2001).

Distilled, these cases stand for the proposition that to establish a nexus sufficient to support a search warrant for a residence there must be more than the mere fact that the person committed the crime and lives or works at the place to be searched. The Third Circuit examined the nexus question in United States v. Zimmerman, 277 F.3d 426 (3d Cir. 2002). There a search warrant was issued authorizing officers to search the defendant's home for child and adult

12

pornography.  Id. at 429.  The defendant moved to suppress items recovered in that search, which the district court denied.  On appeal the Third Circuit reversed, concluding that the affidavit supporting the warrant did not establish a substantial basis for concluding that either adult or child pornography would be found in the home.  Id.  There was no direct link to the defendant's home, and the defendant's numerous sexually assaultive incidents combined with the inspector's experience that similar offenders keep child pornography near them was *insufficient* to establish a reasonable inference.  Therefore, the warrant was invalid.

The Third Circuit has permitted searches in the absence of a direct link only where the particular offense involved, in combination with the specific information provided in the affidavit, permitted an inference that evidence of a crime would be found in the particular place to be searched.  For example, searches of drug dealers' homes have been permitted where the nature of the particular suspect's drug dealing, together with additional facts or the officers' experience, supported an inference that the dealer would keep evidence of transactions or proceeds in his home.  See Hodge, 246 F.3d at 306 (affidavit established defendant was experienced drug dealer operating drug business who would need to store evidence of illicit activities, reasonable to infer that such person could conclude that his residence was best, and probably only, location to store items such as records of transactions, cash and assets purchased with proceeds, and experienced officer swore in affidavit that defendant's home was likely to contain evidence of drug activities); United States v. Conley, 4 F.3d 1200, 1206-07 (3d Cir. 1993) (search of business entity for evidence of illegal gambling operation supported by affidavit stating that business owned 42 video poker machines, address of business was determined through applications for permits for machines and owner of business had recent conviction for

13

identical illegal conduct).

This case, however, is one in which evidence of a homicide, as opposed to crimes involving drugs or illegal business activities, was sought by the police. In contrast to drug trafficking and illegal business activity cases, courts have declined to infer a nexus between the home of a defendant and the murder weapon in homicide cases. For instance, in United States v. Bethal, 245 Fed.Appx. 460 (6th Cir. 2007), an unreported case from the Sixth Circuit, police officers obtained a warrant to search the residence of Bethal, who had been implicated in a gang-related homicide. Id. at 461-64. The warrant was issued approximately two months after the homicide and authorized the police to search for several types of guns, ammunition for those guns or other guns, marijuana, and "all contraband, other drugs, and evidence of gang affiliation." Id. at 463. The affidavit in support of the warrant contained sworn testimony linking Bethal to the homicide, together with statements that he was a gang-member, and that he lived at the address to be searched. See id. The Sixth Circuit found this information insufficient to support a finding of probable cause that the items sought would be located at Bethal's residence. See id. at 468-69. In so holding, the Court noted that while it is sometimes permissible to infer in cases involving drug dealers that they routinely keep drugs at home, that such an inference involving murder weapons being found at a suspect's residence would be less likely to be valid because "persons accused of murders often dispose of the guns utilized in the crime soon afterward." Id.

Likewise, in United States v. Charest, 602 F.2d 1015 (1st Cir. 1979), the First Circuit was presented with a situation in which a firearm was discovered at the defendant's residence while the defendant was being investigated for murder, and the defendant was subsequently charged

14

with being a felon in possession of a firearm.  Id. at 1015-16.  The affidavit supporting the warrant to search Charest's residence provided detailed information concerning Charest's involvement in the murder from a confidential informant, but failed to provide information linking Charest to the residence, or any information as to why the affiant believed that the item sought, a handgun, would be found at the residence.  Id. at 1016-17.  The First Circuit found that the affidavit provided no nexus between the item sought and the place to be searched, and also found that the magistrate could not infer that the handgun would likely be found at a murder suspect's residence on the basis that the opposite inference – that a murderer would not keep a murder weapon linking himself to the crime at home – would be more likely.  Id. at 1017 ( "Common sense tells us that it is unlikely that a murderer would hide in his own home a gun used to shoot someone.").

He also averred that: a neighbor overheard Ms. Brown "talking loud" outside her apartment in Woodstown to an individual she (the neighbor) *assumed* was Mr. McAleese, (Aff. ¶ 5-E);  a few minutes thereafter, this same neighbor noticed that Ms. Brown's vehicle was gone

Here, Detective Quinn failed to provide the issuing judge with any evidentiary support to infer that evidence relating to the murder in Woodstown, New Jersey would be found at Mr. McAleese's residence 35 miles away in Maple Shade, New Jersey.  In the affidavit, Detective Quinn discussed how Ms. Brown died from severe blunt force trauma to the back of her head, (Aff. ¶ 5-A); how evidence of the assault – "pools of blood, high velocity blood spatter, brain matter, and bone fragments" – were observed in plain view through Ms. Brown's vehicle's windows, (Aff. ¶ 5-C); and how Mr. McAleese's clothes and hands were soaked with blood, and blood spatter was observed on his face and forehead, (Aff.¶ 5-G).

He also averred that: a neighbor overheard Ms. Brown "talking loud" outside her apartment in Woodstown to an individual she (the neighbor) *assumed* was Mr. McAleese, (Aff. ¶ 5-E);  a few minutes thereafter, this same neighbor noticed that Ms. Brown's vehicle was gone

while Mr. McAleese's vehicle remained, (Id.);  Mr. McAleese stated that after visiting Ms. Brown at her apartment, Ms. Brown drove to the "Corner Bar," (Aff. ¶ 5-B); when Ms. Brown failed to return, Mr. McAleese walked to the bar, at which time he observed Ms. Brown slumped over in her vehicle, (Id.); and (5) at 11:15 p.m., the police received a call from the hospital regarding Ms. Brown, who was brought to the hospital by Mr. McAleese, an alleged on-again, off-again relationship between Mr. McAleese and Ms. Brown; claims by Ms. Brown's ex-husband that she was afraid of Mr. McAleese; and implications by Ms. Brown's son that a life insurance policy naming Mr. McAleese as the beneficiary, appeared to be forged.  (Id.)

From these facts and inferences, Detective Quinn baldly averred to the issuing judge that there was probable cause to believe that evidence, relating to murder, aggravated assault and weapon possession in the residence.  The problem with this is that there are no facts in Detective Quinn's affidavit indicating that Ms. Brown was killed anyplace besides her vehicle.  There is nothing in the affidavit indicating that Ms. Brown was ever present at Mr. McAleese's apartment at any point on the date she was murdered (when that was is anybody's guess since it's not stated anywhere in the warrant or supporting affidavit), or in the days, weeks, or months preceding her death – whenever that death was.

The affidavit supporting the search of the residence was clearly insufficient to establish a nexus.  As such, the Third Circuit's conclusion on the Zimmerman affidavit controls this case. Given the absence of any evidence connecting Ms. Brown's murder to the target premises, absolutely no temporal or proximate link exists on the face of the affidavit that Apartment C-21 contained evidence of murder, aggravated assault, weapon possession, heroin possession or possession of drug paraphernalia.  In the absence of such evidence or rational inference, the

affidavit in support of the search warrant established no nexus between Carole Brown's homicide and Mr. McAleese's residence, and therefore, the warrant was invalid.

A warrant may issue based only on probable cause, and probable cause to support a search warrant exists when "there is a fair probability that contraband or evidence of a crime will be found in a particular place."  United States v. Jones, 994 F.2d 1051, 1056 (3d Cir. 1993) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).  The information that supports a warrant must, when viewed within the totality of the circumstances, provide a substantial basis to conclude that a search would uncover evidence of wrongdoing.  See Gates, 462 U.S. at 238-39; United States v. Harvey, 2 F.3d 1318, 1321-22 (3d Cir. 1993).  Probable cause may be inferred from "the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide [instruments or proceeds from the crime]."  Jones, 994 F.2d at 1056 (citations omitted).  But when deciding whether an affidavit supporting a warrant articulates probable cause sufficient to justify a search, the reviewing court may consider only the information presented to the magistrate – namely, the contents of the affidavit itself.  See United States v. Hodge, 246 F.3d 301, 305 (3d Cir. 2001).  "[I]f the information is too old, it is considered stale and probably no longer exists."  Sgro v. United States, 287 U.S. 206, 210-12 (1932).

The search warrants for the residence and cellular telephones are not supported by probable cause because they do not state the date in which the underlying criminal activity – murder – allegedly occurred and there is no way to infer from the affidavits in support of the

warrants how recently the murder they describe might have taken place.[3]  Indeed, the murder could have occurred a week, a month, or a year before the affidavits were prepared by Detective Quinn.

Helpful here is the Fourth Circuit's decision in United States v. Doyle, 650 F.3d 460 (4th Cir. 2011).  Doyle involved a defendant charged with receipt, possession and mailing of child pornography.  In that case, officers executed a search warrant at Doyle's residence.  Id. at 463-64. The affidavit in support of the warrant alleged that Doyle had shown nude pictures of young children to the informant's step-nephew.  Id. at 472.  However, the affidavit provided no information regarding when Doyle showed the pictures to the step-nephew.  Id. at 474.

Recognizing that an affidavit must provide evidence of recent criminal activity at the place to be searched, the Doyle court opined that "the *only* critical date was the date when Doyle allegedly showed Victim 1 a nude photograph.  As that date was omitted, there was nothing on which a reasonable officer could rely to conclude that a sufficiently limited period of time had elapsed to justify the search."  Doyle, 650 F.3d at 476, n.18 (emphasis in original).  Because the evidence offered in the affidavit was so deficient, the Fourth Circuit found that "it was unreasonable to believe that probable cause was demonstrated to search Doyle's home given the complete absence as to when the pictures were possessed."  Id. at 474.

As in Doyle, Detective Quinn's affidavits in support of the searches for Mr. McAleese's residence and cellular telephones provided "zero indication" as to when the underlying criminal activity occurred.  650 F.3d at 463.  In other words, the affidavits do not indicate the date of the

---

[3]  For instance, the affidavits indicate that (1) at 11:25 p.m., Carole Brown was pronounced dead; and (2) Mr. McAleese was interviewed and charged with her death. However, even these averments do not suggest timely or fresh information.

murder or for that matter any of the events described in the warrants.  The Third Circuit requires a close temporal connection between the alleged criminal activity and the issuance of the search warrant.  See Harvey, 2 F.3d at 1322 ("If too old, the information is stale, and probable cause may no longer exist.").  See also United States v. Grubbs, 547 U.S. 90, 95 n.2 (citing United States v. Wagner, 989 F.2d 69, 75 (2d Cir. 1993) for the proposition that "[T]he facts in an affidavit supporting a search warrant must be sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist as of the time of the search and not simply as of some time in the past."); Sgro, 287 U.S. at 210-11 ("While the statute does not fix the time within which proof of probable cause must be taken by the [judge] or commissioner, it is manifest that the proof must be of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time.").  In this case, Detective Quinn's failure to include in the affidavits the date in which the murder occurred is especially troubling because of the nature of the evidence sought and the nature of the illegal activity.  By definition, murder suggests quick disposal of contraband.  Accordingly, the need for the affidavits to recite the actual date of the murder is imperative to a finding of probable cause.

Pursuant to Doyle, an affidavit that does not provide any information as to when the alleged criminal activity took place is not sufficient to show the existence of a fair probability that contraband will be found at the place to be searched.  Because the warrants issued to search Mr. McAleese's residence and cellular telephones failed to provide a temporal connection between the murder and the issuance of the warrants, they were invalid for want of probable cause.  Such being the case, the proceeds of those searches should be suppressed.

19

**B.      The Warrant To Search The Cellular Telephones Was  Fatally Flawed Because it Was Overbroad**

The evidence seized during the execution of the warrant for the cell phones should also be suppressed because the warrant was overly broad in the scope of the search requested and approved.  Specifically, this warrant requested approval to search for evidence of possession heroin and possession of drug paraphernalia – despite the fact there was no mention of facts supporting the presence of  heroin or drug paraphernalia in the affidavit of probable cause.

The Fourth Amendment instructs that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularity describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  See also Massachusetts v. Sheppard, 468 U.S. 981, 988 n.5 (1984).  The particularity requirement ensures that a citizen is not subjected to a "general, exploratory rummaging in [his personal] belongings," Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971).  A warrant fails to satisfy the particularity requirement if it leaves the determination of the items to be seized to the discretion of the investigating officer.  See Marron v. United States, 275 U.S. 192, 196 (1927)   ("As to what is to be taken, nothing is left to the discretion of the officer executing the warrant."); United States v. Tracey, 597 F.3d 140, 146 (3d Cir. 2010) (quoting Marron).  The particularity requirement applies to the warrant, as opposed to the application or affidavit in support submitted by the affiant.  See Groh v. Ramirez, 540 U.S. 551, 557 (2004).  Thus, "[t]he fact that the application adequately described the 'things to be seized' does not save the warrant its facial invalidity."  Groh, 540 U.S. at 557.  And where, as here, a warrant is invalid due to insufficient particularity, the search pursuant to that warrant is unconstitutional and its fruits must be suppressed.  See id. at 559; Wong Sun v. United States, 371

U.S. 471 (1963).  Accord Sheppard, 468 U.S. at 988 n.5.

The Fourth Amendment also requires that a warrant be no broader than the probable cause

on which it is based.  "[A]n overbroad warrant 'describe[s] in both specific and inclusive terms

what is to be seized,' but it authorizes the seizure of items as to which there is no probable cause."

United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven

Cents, 307 F.3d 137, 149 (3d cir. 2002).  Although the concept of probable cause resists an

exacting definition, it "exist[s] where the known facts and circumstances are sufficient to warrant

a man of reasonable prudence in the belief that contraband or evidence of a crime will be found"

in a particular place.  Ornelas v. United States, 517 U.S. 690, 696 (1996).

It is with these above standards in mind, that the defense asserts that the warrants in

question here were vague and overbroad.  In the warrant for the cellular telephones, Detective

Quinn identified the following items as things to be seized:

> All information stored in the telephone, including but not limited to,
> assigned mobile telephone number, Electronic Serial Number (ESN),
> International Mobile Equipment Identifier (IMEI) number, Internation
> Mobile Subscriber Identity (IMSI) number, serial number, service
> provider, stored list of all incoming telephone calls, all outgoing
> telephone calls, stored contact lists, *any other evidence or information*
> *tending to establish the commission of the crimes of Murder . . .,*
> *Possession of a Weapon for an Unlawful Purpose . . ., Possession of*
> *CDS/Heroin . . ., and Possession of CDS Paraphernalia . . ., that a*
> *thorough and diligent search may disclose will be seized.*

Exhibit "B," Search Warrant, ¶ 1, pgs. 1-2 of 3 (emphasis added).

There is no evidence or more importantly averments in the affidavit of probable cause for

the cell phone warrant supporting a search for drugs and in particular heroin.  And this fact – by

itself – that the warrant requested (and received) approval for such searches and seizures renders it

facially invalid.  The warrant clearly "vest[ed] the executing officers with unbridled discretion to

conduct an exploratory rummaging through [Mr. McAleese's] [cellular telephones and apartment]

in search of criminal evidence" related to crimes with no nexus to the murder investigation.

Tracey, 597 F.3d at 151.  The direct and indirect fruits of the search of the phone consequently

must be suppressed.

### C.	The Affidavits' Failure To State Probable Cause Sufficient To Justify The Issuance Of The Search Warrants Were Plain And Thus The Good Faith Exception To The Warrant Requirement Therefore Does Not Apply

Finally, this is not a situation where the police should be permitted to rely on Leon's good

faith exception to salvage the searches.  See United States v. Leon, 468 U.S. 897 (1984); see also

Gluck v. United States, 771 F.2d 750, 757 (3d Cir. 1985).  A search pursuant to a warrant will be

upheld, even if not supported by probable cause, where "an officer executes a search in

objectively reasonable reliance on a warrant's authority."  Zimmerman, 277 F.3d at 436 (quoting

Hodge, 246 F.3d at 307).  Suppression remains a remedy, however, in four circumstances, three of

which are pertinent in this case: (1) where the magistrate abandoned his or her judicial role and

failed to perform his or her neutral and detached function; (2) "when the affidavit is so lacking in

indicia of probable cause as to render official belief in its existence entirely unreasonable;" and (3)

where the warrant was so facially deficient that it failed to particularize the place to be searched or

things to be seized.  Zimmerman, 277 F.3d at 426-27 (citing Hodge, 246 F.3d at 308; Leon, 468

U.S. at 923).

### 1.	The Apartment

In this case, no issuing judge could infer that evidence relating to murder would likely be

found at Mr. McAleese's residence.  Not only was the warrant in this case not issued upon

probable cause, but any reliance on the warrant by the police was objectively unreasonable.  As discussed supra, the affidavit supporting the search of Mr. McAleese's apartment made no assertions linking Apartment C-21 to the murder of Carole Brown.  Indeed, the affidavit is devoid of any facts suggesting that Apartment C-21 was linked to *any* criminal activity.  So without any indicia of nexus between alleged criminal activity and the property, the police could not reasonably have believed a sufficient basis existed to validate their execution of the McAleese warrant.  Just as in Zimmerman, the police cannot pretend to be ignorant of their duties, and the complete lack of a nexus between alleged criminal acts and a particular location cannot be explained away by good faith.

Further supporting the lack of good faith with the warrant to search Mr. McAleese's apartment is the paltry showing actually made by the police.  Instead of a detailed and factually complete supporting affidavit, Detective Quinn presented a summary of the ongoing homicide investigation with irrelevant inferences to an unrelated life insurance policy.  He also failed to include the date of the murder or for that matter the date of any of the events described in the affidavits of probable cause.  This information never suggests that Mr. McAleese's apartment was linked to the murder or any illegal activity whatsoever.  In fact, the insurance policy was discovered in the murder victim's apartment.

Finally, just as in Zimmerman, the police were under no time pressure to execute the search of Apartment C-21.  Mr. McAleese had already been arrested and there was zero evidence of wrongdoing connected to the apartment, so the police had absolutely nothing to lose by conducting further investigation.  This make reliance on the inadequate warrant even more unreasonable, since it would have been obvious that the affidavit was insufficient and there would

be no detriment to further investigation.

### 2.        The Apartment and the Cellular Telephones

For reasons previously discussed, the search authorized by the warrant for the cellular telephones was overbroad. It permitted the search for illegal drugs (heroin) and paraphernalia that simply is not supported by any of the averments in the affidavit of probable cause.  When confronted with similarly overbroad warrants, courts have held that the good faith exception cannot apply.  See e.g., United States v. George, 975 F.2d 72, 74, 77 (2d Cir. 1992) (warrant containing catch-all provision authorizing search for "any other evidence of a crime" facially overbroad to a degree prohibiting application of the good faith exception); United States v. Leary, 846 F.2d 592 (10th Cir. 1988) (warrant authorizing search for every conceivable business record at specified location overbroad to a degree prohibiting reliance on the good faith exception).

In sum, the issuing judge and law enforcement authorities in this case were not justified in relying upon the warrants because on their fours corners the affidavits were "so lacking in indicia of probable cause as to render official belief in [their] existence unreasonable."  Zimmerman, 277 F.3d at 426-27 (citing Hodge, 246 F.3d at 308; Leon, 468 U.S. at 923).  As the Fourth Circuit held in Doyle, supra:

> While "objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion [of evidence]," . . . United States v. Leon, 468 U.S. 897, 922-23 . . . where [as here] the warrant application included . . . zero indication as to when [the crime] was committed, we conclude that the exclusion of the evidence obtained from the search in this case is an appropriate remedy.

650 F.3d at 463.

Taking all the above flaws together, "[a]ny reasonably well-trained officer in the

24

'stationhouse shop would recognize as clearly insufficient' the affidavit[s] that w[ere] presented to the magistrate."  <u>Zimmerman</u>, 277 at 437 (quoting <u>United States v. Williams</u>, 3 F.3d 69, 74 (3d Cir. 1993)).  The good faith exception therefore does not apply to rescue the proceeds of the searches from exclusion as the proceeds of illegal searches.  The Court should therefore grant Mr. McAleese's motion to suppress.

**III.     CONCLUSION**

The searches of the cellular telephones and the apartment were done pursuant to warrants that lacked support in probable cause.  The warrant for the cellular phones was overly broad in the scope of the search requested and approved .  The searches consequently violated defendant's Fourth Amendment rights, and the Court should suppress the direct and indirect evidence of the illegal searches as "fruit of the poisonous tree."  <u>See</u> <u>Wong Sun v. United States</u>, 371 U.S. 471 (1963).

Respectfully submitted,

<u>/s/ *James J. McHugh, Jr.*        </u>
JAMES J. MCHUGH, JR.
Assistant Federal Defender

25

## **CERTIFICATE OF SERVICE**

I, James J. McHugh, Jr., Assistant Federal Defender, Federal Community Defender Office for the Eastern District of Pennsylvania, hereby certify that I have served a true and correct copy of the Defendant's Motion to Suppress Physical Evidence, with Memorandum of Law in Support Thereof, upon Eric B. Henson, Assistant United States Attorney, by electronic case filing and hand delivery to his office at the United States Attorney's Office located at 615 Chestnut Street, Suite 1250, Philadelphia, Pennsylvania 19106, on the date indicated below.

/s/ *James J. McHugh, Jr.*
JAMES J. MCHUGH, JR.
Assistant Federal Defender

DATE:          November 21, 2012