**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **CRIMINAL NO.  12-239-1** |
| | : | |
| | : | |
| **FRANK G. MCALEESE** | : | |

**DEFENDANT'S POST-HEARING MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTIONS TO SUPPRESS PHYSICAL EVIDENCE
AND OUT-OF-COURT AND IN-COURT IDENTIFICATIONS**

Defendant Frank G. McAleese, through undersigned counsel, hereby submits this Post-

Hearing Memorandum of Law in support of the motions to suppress filed in this matter.  For the

reasons set forth in the defendant's original suppression motions, for the reasons that unfolded at

the suppression hearing on January 24, 2013, and for the reasons set forth below, Mr.

McAleese's motions should be granted in their entirety.  All of the challenged physical evidence

and in-court and out-of court identifications must be suppressed.

    **A.**     **Detective Quinn's Affidavit In Support Of The Warrant To Search The
"Cricket" Cellular Telephone Was Tainted By Intentional Or Reckless
Falsehoods Critical To The Probable Cause Determination**

In order to give meaningful effect to the protection provided by the Fourth Amendment,

the United States Supreme Court has recognized a "right . . . to challenge the truthfulness of

factual statements made in an affidavit supporting a warrant."  Franks v. Delaware, 438 U.S. 154,

155 (1978).  As the Court recognized, "a flat ban on impeachment of veracity could denude the

probable-cause requirement of all real meaning."  Id. at 168.  "The requirement that a warrant not

issue 'but upon probable cause, supported by Oath or affirmation,' would be reduced to a nullity

if a police officer was able to use deliberately falsified allegations to demonstrate probable

cause." Id.

While Franks thus rejected "an *absolute* ban on post-search impeachment of veracity," the "rule it announced has a limited scope, both in regard to when exclusion of the seized evidence is mandated, and when a hearing on allegations of misstatements must be accorded." Id. at 167 (emphasis in original). With respect to evidentiary hearings, the Supreme Court held that a defendant is entitled to a hearing on the veracity of an affidavit in support of a search warrant only if he makes a "substantial preliminary showing" that: (1) the affiant deliberately or recklessly included false statements, or failed to include material information, in the affidavit; and (2) the challenged statements or omissions were essential to the magistrate judge's finding of probable cause. Franks, 438 U.S. at 155-56; United States v. Calsito, 838 F.2d 711, 714 (3d Cir. 1988). At the hearing, a search warrant will be voided, and evidence suppressed, only if "the allegation of [material] perjury or reckless disregard is [then] established by the defendant by a preponderance of the evidence." Franks, Id. at 156.

### 1.     Applying Franks to This Case

Detective Dennis Quinn of the New Jersey State Police, intentionally or recklessly included false information in his affidavit when he represented that the Samsung "Cricket" cellular telephone was recovered from the Hyundai Tucson – the vehicle in which Ms. Brown was murdered – when, in fact, it was seized from Mr. McAleese's 2005 Ford Taurus. For this reason alone – the evidence seized from the phone and the fruits of all evidence thereafter must be suppressed.[1]

---

[1] Even if Detective Quinn was not the source of this information, under Franks, statements are not limited to the actual affiant of the warrant but extend to other officers (governmental individuals) who supply said information. Indeed, "a different rule would permit

After alleging a specific falsehood, Franks requires that the defendant clear two hurdles. The first hurdle is the "offer of proof," Franks, 438 U.S. at 171, the second is materiality.  "[I]f these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required."  Id. at 171-72.  If, on the other hand, the remaining content is insufficient, Mr. McAleese is entitled to relief.

### 2.   **Proof of the False Information**

The following underlined information in paragraph H of the probable cause section of Detective Quinn's affidavit[2] is deliberately misleading and false:

> H.   When Frank Maclaine was placed under arrest, he was found to possess the aforementioned Samsung "Jitterbug" cellular telephone (MODEL SPT-A310, Bearing Serial Number 268435458905807471).  During the execution of the search warrant on the vehicle whereupon the crime was committed (2006 Hyundai Tucson, bearing New Jersey Registration YHH13B, and Vehicle Identification Number KM8JM 12B86 U2528 78), a Samsung "Cricket" Cellular Telephone, Model SCH-R211, bearing serial number 268435459000212693 was located therein.

(See) Exhibit "A") (underline added).

---

government officials deliberately to keep from affiants or the court information material to the determination of probable cause and by such conduct avoid the necessity of a Franks hearing." United States v. DeLeon, 979 F.2d 761, 764 (9th Cir. 1992).  See also United States v. Kennedy, 131 F.3d 1371, 1376 (10th Cir. 1997) (the court will "hold the government accountable for statements made by other government employees which were deliberately or recklessly false or misleading insofar as such statements were relied upon by the affiant in making the affidavit"); Calisto, 838 F.2d 711 (if this were not the case "we would place the privacy rights protected by [Franks] in serious jeopardy"); United States v. Pritchard, 745 F.2d 1112 (7th Cir. 1984) (Franks covers case in which one government agent recklessly misrepresents information to a second agent, who innocently includes misrepresentation in his affidavit).

[2]  Marked at the hearing as Government Exhibit 8 and attached hereto as Exhibit "A."

As proof of the false assertion contained in paragraph H, Mr. McAleese offers the New Jersey State Police Crime Scene Evidence Log.[3]  A review of this document, which recorded the items seized from the Ford Taurus on November 10, 2011, reveals that the Samsung "Cricket" cellular telephone was found in the driver's side door of the Ford Taurus – not the Hyundai, Tucson.

Moreover, Detective Quinn's assertion was made with knowledge of its falsity or with reckless disregard for the truth.  Detective Quinn personally knew – or would have known except for his reckless disregard of the truth – that the Samsung "Cricket" cellular telephone came from Mr. McAleese's Ford Taurus – as opposed to the vehicle where the murder likely occurred – at the time he submitted his affidavit.  Indeed, there are compelling reasons for believing this.

First, the evidence log clearly discloses that the Samsung "Cricket' cellular telephone was recovered from the Ford Taurus on November 10, 2011.  This was five days prior to Detective Quinn's application for the warrant to search the Samsung "Cricket" cellular telephone on November 15, 2011.  In fact, Detective Quinn acknowledged at the suppression hearing that the evidence log/ledger showed that the Cricket phone was recovered from the Taurus and that paragraph H of his affidavit was inconsistent with that.  (See Transcript of Motion Hearing, 01/24/2013 ("Tr."), 35:12-21).  Detective Quinn conceded that the warrant was incorrect testifying: "[t]hat portion of [paragraph H]" was incorrect.  (Tr. 35:21-25; 36:1).

Second, although Detective Sergeant F. McGovern applied for the warrant to search Mr. McAleese's Ford Taurus, Detective Quinn would have been aware that the Samsung "Cricket" cellular telephone came from that vehicle because Paragraphs A-G of Detective Quinn's affidavit

_____

[3]  Marked at the hearing as Government Exhibit 7 and attached hereto as Exhibit "B."

to search the cellular telephones are exactly the same as Paragraphs A-G of Detective McGovern's affidavit to search the Ford Taurus. Indeed, Detective Quinn testified that before getting a search warrant, he typically reviews many documents. With respect to this case, Detective Quinn testified, "I'm sure I went through everything and all the paperwork. . . ." (Tr. 32:7-15). He also testified that it was "correct" that he knew that there had already been a search warrant for the car to get the Cricket phone prior to his swearing out the warrant for the actual search of the Cricket phone. (Tr. 33:2-10).

Third, Paragraph D of both affidavits suggests that Detective Quinn played a role in the impoundment and towing of the Ford Taurus on November 10, 2011. (See Exhibit "A"). This evidence clearly raises questions about the veracity of Detective Quinn's probable cause affidavit in support of a warrant to search the Samsung "Cricket" cellular telephone.

Accordingly, the Court should find that Mr. McAleese has successfully cleared the first hurdle of the Franks analysis. He has made a "substantial preliminary showing" that the judge issuing the warrant in this case was misled by information in the affidavit that Detective Quinn knew was false or would have known was false except for his reckless disregard of the truth. Franks, 438 U.S. at 155-56. See United States v. Brown, 631 F.3d 638, 649 (3d Cir. 2011) (affirming district court's opinion to grant defendant's motion to suppress a sample of his DNA pursuant to Franks v. Delaware; holding that "[A] court may properly infer that an affiant acted with reckless disregard for the truth where his affidavit contains an averment that was without sufficient basis at the time he drafted it.").

### 3.   Materiality of the False Information

The Court should also find that Detective Quinn's assertion was essential to the issuing

5

justice's determination of probable cause in issuing the warrant to search Mr. McAleese's

Samsung "Cricket" cellular telephone.  In accordance with <u>Franks</u>, if the false assertion was

excised from paragraph H of the affidavit and its contents reassessed, Paragraph H would be

essentially reduced to the following facts:

> H.    When Frank Maclaine was placed under arrest, he was found to possess the aforementioned Samsung"Jitterbug" cellular telephone (MODEL SPT-A310, Bearing Serial Number 268435458905807471).

(<u>See</u> Exhibit "A").  Without a doubt, the exclusion of any reference in the affidavit to the last

sentence of paragraph H regarding the Samsung "Cricket" cellular telephone "eviscerates

probable cause" to search that particular cellular telephone.  <u>United States v. Brown</u>, 647

F.Supp.2d 503, 513 (W.D. Pa. 2009).

In the absence of any other independent facts to establish probable cause to search the

Samsung "Cricket" cellular telephone, a factually truthful version of the affidavit would not have

provided a neutral justice with facts sufficient for him to conclude that the cellular telephone was

linked to the murder; and that, accordingly, there was a "fair probability" given the totality of the

circumstances and common sense, <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983), that evidence of

the murder would be found within the Samsung "Cricket" cellular telephone.  Indeed, only one

assertion in the affidavit created probable cause to search the Samsung "Cricket" cellular

telephone: Detective Quinn's statement that the Samsung "Cricket" cellular telephone was

located within the vehicle where the murder was committed.  The relevancy of this assertion was

clearly critical to the judicial officer's finding of probable cause because it provided an

evidentiary nexus between the Samsung "Cricket" cellular telephone and the crime.  Without that

assertion, the four corners of the search warrant would have only set forth probable cause to

search the Samsung "Jitterbug" cellular telephone.  Hence, the inclusion of the untrue information in the affidavit was material and Franks is applicable.

Mr. McAleese is entitled to relief in the form of suppression.  Obtained in violation of the Fourth Amendment, the Samsung "Cricket" cellular telephone is "fruit of the poisonous tree." See Wong Sun v. United States, 371 U.S. 471 (1963).  It, therefore, must be suppressed.  As derivative evidence of the "Cricket" cellular telephone, the phone number for Lock's Philadelphia Gun Exchange, ATF 4473 forms, Pennsylvania State Police Application/Record of Sale forms, Lock's sales receipts/paperwork, and out-of-court and in-court identifications, must be suppressed as tainted fruit of the proverbial tree as well.

### 4.      Good Faith Does Not Save The Search Warrant

Finally, this is not a situation where – in an effort to protect the admission of this evidence – the actions of the officers should be excused under the objective-reasonableness exception of United States v. Leon, 468 U.S. 897 (1984); see also Gluck v. United States, 771 F.2d 750, 757 (3d Cir. 1985).  The Third Circuit has specifically noted that "[g]ood faith is not a magic lamp for police officers to rub whenever they find themselves in trouble."  United States v. Zimmerman, 277 F.3d 426, 438 (quoting United States v. Reilly, 76 F.3d 1271, 1280 (2nd Cir. 1996)).  In this case, good faith does not save the search warrant because under Leon, a Franks violation is not excusable.  Leon, 468 U.S. at 914 & n.12, 923.

Detective Quinn's actions were not reasonable when he applied for the warrant. Detective Quinn had a duty to provide the issuing judge with information – i.e., the Samsung "Cricket" cellular telephone was not found in the vehicle where the murder was likely committed – which would totally undercut the warrant's validity with respect to the Samsung "Cricket"

cellular telephone.  Indeed, had the issuing judge been aware that the Samsung "Cricket" cellular

telephone had come from a vehicle with no apparent connection to the murder, Detective Quinn's

application for a warrant to search the Samsung "Cricket" cellular telephone would have been

denied.  These facts are clearly sufficient to negate any "good faith" defense, in the Leon sense.

Accordingly, the physical and identification evidence set forth above must be suppressed.

**B.     The Unlawful Warrantless Impoundment Of Mr. McAleese's Vehicle Prior
To The Issuance Of The Search And Seizure Warrant Requires The
Exclusion Of Any Evidence**

During direct and cross-examination at the suppression hearing, Detective Sergeant

Francis McGovern testified that it was "standard protocol" for a vehicle to be towed to a secure

location when a search and seizure warrant is being sought.[4] (Tr. 17:9-14; 21:4-9).  Asked to

elaborate on this by defense counsel, Detective McGovern stated:

> If you have evidence of a crime with movable property such as a motor vehicle,
> sometimes applying for a search warrant . . . can take sometimes hours or days
> depending on each individual case.  In order to best secure evidence of movable
> property, we as a matter of protocol move the vehicle to a secured location like a
> secured sally port or a secured garage and it does a number of things.  It ensures
> the security of the vehicle that nobody can have unauthorized access to the vehicle
> and it also is a manpower issue.  If we keep a motor vehicle in an unsecured area,
> then we have to post either a trooper or detective on that vehicle to maintain chain
> of custody.

(Tr. 21:10-23).  When asked if this was a written policy, Detective McGovern testified that he

would have to refer to their SOPs (standard operating procedures), "but it's been a standing

procedure as long as I've been a detective."  (Tr. 21:25; 22:1-3).  With respect to whether he has

---

[4]  When applying for the search and seizure warrant for the Ford Taurus, Detective
McGovern testified that "to the best of his recollection," the Ford Taurus had already been towed
to, and secured at, Troop A Headquarters in Buena Vista, New Jersey, which is approximately
fifty miles away from the apartment complex where the Ford Taurus had been parked.  (Tr. 20:7-
25; 21:1-3).

ever seen a written protocol concerning the seizure or impounding of evidence, Detective

McGovern testified that he "may have, but that he would have to refer to . . . the SOP." (Tr.

22:4-7). Since he doesn't know for sure if the New Jersey State Police's protocol concerning

impoundment is in writing, Detective McGovern stated his reason for saying that it was "protocol"

was because it's a "police practice." (Tr. 22:9-21). However, Detective McGovern testified,

"[t]here is" an actual book of New Jersey State Police SOPs, (Tr. 22:22-24) consistent with what

he testified to at the hearing. (Tr. 22:25; 23:1-3). When asked on re-direct examination if he

could promptly supply counsel for the government and the defense with the SOPs concerning

impoundment, Detective McGovern said that "I [or any detective] can make them available."

(Tr. 23:25; 24:1-7).

It has now been over a month since Detective McGovern assured the Court and counsel

that he could produce SOPs setting forth the written policy requiring that "movable property such

as a motor vehicle" be towed to a secure location "as a matter of protocol" when a search and

seizure warrant is being sought. (Tr. 21:10-23). Despite a recent request, no SOPs have been

produced as of the date of this filing.

The decisions in United States v. Smith, 522 F.3d 305 (3d Cir. 2008) and United States v.

Duguay, 93 F.3d 346 (7th Cir. 1996), are helpful examples of when the police may, and may not,

lawfully make a warrantless seizure of an otherwise lawfully parked motor vehicle following the

arrest of its operator. For example, in Smith, the Third Circuit addressed "the constitutionality of

a vehicle impoundment under the Fourth Amendment in circumstances in which there is no

standardized policy regarding the impoundment and towing of vehicles." Id. at 310. Stating that

it was not aware of any direct Third Circuit precedent on this issue, the Smith Court relied on

precedent from the First Circuit which "focus[ed] on the reasonableness of the vehicle impoundment for a community caretaking purpose." Id. at 314.

The Third Circuit in Smith – relying on United States v. Coccia, 446 F.3d 233 (1st Cir. 2006) – held that the circumstances surrounding the seizure of the Smith vehicle reasonably required the police to have the vehicle towed where: the occupants of the vehicle were both arrested and thus could not drive the vehicle; the area in which the vehicle was stopped was one where the vehicle was subject to being damaged, vandalized, or stolen; and, the vehicle was not owned by either of its occupants and the police did not know who owned the vehicle. Smith, 522 F.3d at 314. In view of these circumstances, the Third Circuit held that the seizure of the vehicle was reasonable under the Fourth Amendment, despite the fact that the city's police department had no "standardized policy regarding the impoundment and towing of vehicles" at the time. Id. at 314-15.

None of the above facts are present in this case. And in so holding the Court emphasized:

> [W]e have not overlooked that . . . it may be desirable that the police execute impoundments for community caretaking purposes pursuant to standardized procedures because the requirement that they do so will tend to encourage the police to avoid taking arbitrary action. Therefore, we certainly do not suggest that police departments should not adopt standard impoundment policies.

Id. at 315.

In Duguay, the Seventh Circuit held that a policy of routinely towing cars when the driver is arrested, regardless of whether another person could remove the car, was constitutionally infirm. 93 F.3d at 353. In that case, because the police department did not have a written policy in place, id. at 351, the Court looked to the officers' testimony to determine if a "standardized routine" for impoundment existed within the department. Id. At the suppression hearing, one

10

officer testified that all vehicles are impounded after the person in control of the vehicle or the owner is arrested.  Id. at 351-52.  A second officer testified that any time an occupant of a vehicle is arrested (regardless of whether they are in control or the owner), the vehicle is impounded.  Id. at 352.  At trial, however, the first officer altered his initial testimony and testified consistently with the second officer, that any time an occupant is arrested the vehicle is impounded.  Id.

The Seventh Circuit held that based on these inconsistencies, the police department's impoundment policy was not sufficiently standardized.  Id.   The court also faulted the officers for not allowing the car's passenger, who had keys to the car, to remove the car from the street.  See id. at 353.  The Court concluded: "The decision to impound an automobile, unless it is supported by probable cause of criminal activity, is only valid if the arrestee is otherwise unable to provide for the speedy and efficient removal of the car from public thoroughfares or parking lots."[5]  Id.

Because the seizure of Mr. McAleese's Ford Taurus was clearly related to an ongoing murder investigation, and not in furtherance of community caretaking functions, Mr. McAleese contends that Smith[6] is distinguishable from this case.  According to Detective McGovern, Mr. McAleese's Ford Taurus was parked in a parking spot at an apartment complex prior to being towed and impounded.  (Tr. 19:8-12).  The vehicle was lawfully parked and there was no testimony that it presented any danger to the public, nor was the vehicle itself shown to be at risk.

---

[5]  While the defense recognizes that Mr. McAleese was not in a position to provide for the "speedy and efficient removal" of his car, the case facts provide that community caretaking was not the reason the police decided to impound Mr. McAleese's vehicle.

[6]  Holding that impoundment reasonable "for community caretaking rather than investigative purposes for which probable cause [is] required."  Smith, 446 F.3d at 314, n.9.

Arguably, as Detective McGovern testified, had the Ford Taurus been parked "in area such as the hospital parking lot [which] poses a lot of issues as it pertains to the security of the vehicle, manpower and whatnot," (Tr. 17:14-17), then the totality of the circumstances may have made it reasonable for the Ford Taurus to have been taken into police custody for community caretaking purposes.  However, unlike the circumstances in Smith, no such noninvestigative purposes for removing Mr. McAleese's vehicle existed here.

Duguay, also supports a determination that the impoundment in this case was unlawful under the Fourth Amendment.  Like the police department in Duguay, which had no written policy or standardized impoundment procedure, the New Jersey State Police appear to have no written towing and impoundment policy or SOP that is followed by the officers of that police department.  The testimony of Detective McGovern was entirely incredible on this point.  Like Duguay, where the officers impounded the defendant's car despite the presence on the scene of a licensed driver readily able to move it, 93 F.3d at 353, the record in this case shows that Mr. McAleese was never afforded an opportunity to make arrangements for a friend or relative to move his vehicle.  Instead, the police – prior to even applying for the search *and seizure* warrant – towed the vehicle over 50 miles away and then impounded the vehicle purely for investigatory purposes.

In sum, the New Jersey State Police had no probable cause to believe that evidence relating to their murder investigation would be found within Mr. McAleese's Ford Taurus; they have failed to produce any written SOPs showing that they are authorized – prior to even obtaining a search and seizure warrant – to tow lawfully parked cars from private property in the wake of an unrelated arrest; and, they had no constitutionally legitimate community caretaking

12

reason to impound the vehicle.  As such, the unlawful warrantless seizure of Mr. McAleese's Ford Taurus was unconstitutional.  Likewise, "if the seizure of the car was unconstitutional, the items later recovered during the search [are] excluded."  Duguay, 93 F.3d at 353.  Therefore, any and all physical evidence found in the Ford Taurus, namely the Samsung "Cricket" cellular telephone, as well as any evidentiary items recovered as a direct and indirect result of searching the "Cricket" cellular telephone, must be suppressed.

C.    **The Out-Of-Court Identification Procedures Were Unnecessarily Suggestive And Conducive To Unreliable Identifications**

In his motion to suppress identifications, Mr. McAleese argued that the out-of-court photographic identification procedures utilized during the investigation of this case were unduly suggestive and led to the owner and sales employees of Lock's Philadelphia Gun Exchange ("Lock's") making unreliable identifications.  Nothing demonstrated the suggestiveness, and undermined the reliability, of these witnesses' identifications more than their own testimony at the suppression hearing on January 24, 2013.

At the suppression hearing, the government called Virginia Lock ("Mrs. Lock"), the owner of Lock's, and two of her salesmen, Dominic Folino ("Mr. Folino"), and John Lock (Mr. Lock).  All three witnesses testified that they recognized Mr. McAleese as the individual depicted in the single, black and white photocopy shown to them by Detective Harold J. McDermott of the New Jersey State Police in March 2012; and, as the individual pictured in the two photographs shown to them by ATF Special Agent Sarah Jane Serafino on multiple occasions in April 2012. Incredibly, all three claimed to remember that the individual depicted in the photograph was named "Frank," despite the passage of fours years since their interaction with this individual.

Also testifying on behalf of the government were Detective McDermott and Agent

13

Serafino. When asked on cross-examination if Mrs. Lock, Mr. Folino and Mr. Lock were as certain and positive about the identity and name of the individual in the photographs back in April of 2012 as they were at the hearing today, Agent Serafino acknowledged that the their testimony today was somewhat different than her recollection of what took place in April 2012. (Tr. 126:17-20). When posed with a similar question about whether these witnesses identified the person depicted in his photograph by name in March 2012, Detective McDermott testified, "No, I don't believe so." (Tr. 107:5-7).

 1. **The Testimonial Record**

 a. **Virginia Lock's Testimony**

When taking the witness stand on January 24, 2012, Virginia Lock testified that she recognized Mr. McAleese when Detective McDermott showed her the photograph because he returned a gun shortly after he purchased it in 2008, and that was highly unusual. (Tr. 42:13-19). Although unable to remember if she was the first person Detective McDermott came in contact with upon entering Lock's, (Tr. 45:20-23), Mrs. Lock did recall that she was working behind the counter when Detective McDermott entered the store and that he came to the counter and said do you recognize this gentleman. (Tr. 46:2-3).

Despite testifying on direct examination that she recognized Mr. McAleese when Detective McDermott showed her the photograph, Mrs. Lock admitted when cross-examined that she didn't remember exactly what she said when shown the photograph. (Tr. 46:14-23). Mrs. Lock further testified that she believed she gave Detective McDermott Mr. McAleese's name when she identified him in the photograph. (Tr. 48:22-25). She also believed that Detective McDermott told her, as well as John and Dominic, that he was showing them the photograph

14

because Mr. McAleese killed someone in New Jersey.  (Tr. 50:12-16; 20-24).  Mrs. Lock testified that although she didn't remember if she asked Detective McDermott if Mr. McAleese had done it with one of her guns, that is something she would have been concerned about.  (Tr. 51:4-9).

Despite the fact that Agent Serafino came to Lock's in April 2012 – one month after Detective McDermott's visit to the store –, Mrs. Lock testified that "months" elapsed before Agent Serafino came into her store.  (Tr. 51:10-12).  Unable to remember how she first came into contact with Agent Serafino, Mrs. Lock testified that "[s]he probably asked for the forms or copies of the forms."  (Tr. 51:16-22).  Mrs. Lock assumed that Agent Serafino supplied the name to her with respect to the individual she wanted the forms for.  (Tr. 51:23-25; 52:1).  When Agent Serafino asked if she could identify the individual in photographs, Mrs. Lock recalled responding Frank Maclaine.  (Tr. 52:12-20).

### b.    Dominic Folino's Testimony

Sales employee Dominic Folino testified that on the day Detective McDermott came to Lock's, he was working behind the counter.  He testified – contrary to Mrs. Lock's testimony – that Virginia Lock was not at the counter.  (Tr. 67:4-12).  Mr. Folino further testified that Detective McDermott showed him the photograph and asked him if he recognized the individual.  (Tr. 67:24-25).  He told Detective McDermott that he did and the males name was Frank.  (Tr. 69:1-9).  "Without any hesitation, I remembered his first name," Mr. Folino testified.  (Tr. 68:12-13).  Although he allegedly remembered Frank from 2008 based on a single sales transaction, Mr. Folino stated that he could not remember what other employees – maybe Dave Scott or Jerry – were present when Detective McDermott showed him the photograph in March 2012.  (Tr.

68:14-24; 69:1-3). When asked if he had to discuss whether or not he recognized the individual in the photograph amongst the other employees, Mr. Folino stated, "No, I sold him the gun." (Tr. 69:7-10). Upon defense counsel bringing to his attention that Detective McDermott wrote that the salesman at the counter was joined by two other employees and that they all spoke amongst themselves, Mr. Folino testified that "that could be." (Tr. 69:14-23). Mr. Folino acknowledged that it was possible that a group formed and started looking at the photograph "after he positively identified Mr. McAleese." (Tr. 70:4-9). If his positive identification of Mr. McAleese was not included in Detective McDermott's report, Mr. Folino testified that it "[c]ould be" that the trooper just left it out. (Tr. 70:10-12). Mr. Folino further testified that shortly after Detective McDermott showed him the photograph, he (Mr. Folino) asked Detective McDermott why he was at the store. (Tr. 72:1-4). He remembers Detective McDermott telling him that the person in the photograph had committed a crime and that it was a criminal investigation. (Tr. 71:7-25; 72:9-14).

When Agent Serafino came into Lock's, Mr. Folino testified she identified herself and asked him to look at two photographs. Mr. Folino said that he told Agent Serafino that he knew the person in the photographs; that the person had been in the store; and that he thought he (Mr. Folino) had sold the person a gun. (Tr. 73:9-14). Mr. Folino also said that since that time, he has looked at the photographs again because Agent Serafino came back to the store a second time and showed him the same photographs. (Tr. 74:16-25; 75:1-6). When asked why Agent Serafino did that, Mr. Folino testified, "I guess just to verify that I knew what I was talking about or didn't change my mind or be any doubt in my mind." (Tr. 75:7-10). Mr. Folino testified that "yes," it is his testimony that on three occasions law enforcement came to the store and showed

him photographs of Frank Maclaine; and, they never showed him any photographs of other individuals besides Frank Maclaine.  (Tr. 75:11-17).

### c.   John Lock's Testimony

"[I] knew right away who it was" John Lock testified when Detective McDermott showed him the single photograph of Mr. McAleese in March 2012.  (Tr. 81:10-18).  Mr. Lock recalled that it was the customer who returned the firearm in 2008.  (Tr. 82:4-6).  Mr. Lock also remembered seeing several pictures of Frank Maclaine.  (Tr. 82:7-10).  He saw the pictures with the state troopers on one occasion and with Agent Serafino on another occasion.  (Tr. 84:3-8).  Mr. Lock acknowledged that perhaps he has seen the pictures with Agent Serafino on more than one occasion.  (Tr. 84:9-11).  On cross-examination, Mr. Lock admitted that from 2008 to 2012, he has "absolutely" dealt with hundreds of gun transactions.  (Tr. 85:13-25; 86:1).  And, he agrees that the transaction involving Mr. McAleese occurred in 2008 and that Detective McDermott came to the gun store in 2012.  (Tr. 86:4-12).

When asked if he remembered anything about the 2008 transaction, Mr. Lock testified that he remembered asking Mr. McAleese if he was related to a couple of boys he went to school with because they had the same last name.  (Tr. 86:13-20).  Besides that, Mr. Lock testified that he remembered nothing unusual about the transaction.  (Tr. 86:25; 87:1-20).  Mr. Lock further testified that it was uncommon for New Jersey troopers to come to the gun store.  (Tr. 87:6-9).  He remembered the trooper introducing himself and asking if he recognized these photos.  (Tr. 87:13-19). When asked if he was by himself when this happened, Mr. Lock testified that "[t]here were probably several of us in the front of the store at the time."  He doesn't recall if he was talking to Detective McDermott by himself, or if Dominic and his mom were with him.  (Tr.

88:11-17).  Mr. Lock testified that he questioned Detective McDermott about why he was at the store.  Mr. Lock said, "well, what did he do."  (Tr. 88:19-23).  Mr. Lock believes Detective McDermott said "he stabbed someone to death."  (Tr. 88:24-25).  Mr. Lock claimed that he was shown the photograph depicting Mr. McAleese before Detective McDermott told him that.  (Tr. 89:3-14).  In spite of the transaction occurring four years ago and hundreds of gun transactions later, Mr. Lock testified that he was still able to recognize the person in the photograph as Frank Maclaine.  (Tr. 89:19-25; 90:1-2).  "I make it a point to remember people's names," Mr. Lock testified.  (Tr. 90:6).

Despite making a point to remember the names of the people who visit the gun store, Mr. Lock testified the next time he was shown photographs was when [Agent] "Mary Jane" came to the store.  (Tr. 90:19-25).  Mr. Lock indicated that Agent Serafino asked him if he recognized the same pictures again, even though he had given the name and identified the photo already with the detectives from Jersey.  (Tr. 91:9-16).  Mr. Lock testified that "I don't know how many months went by, and then I reckon Mary (sic) Jane [ ] asked me the same question."  (Tr. 91:17-18).  Mr. Lock recalled being shown the photographs on two occasions, once with Detective McDermott and once with Agent Serafino.  (Tr. 91:24-25; 92:1-5).

### d.   Detective McDermott's Testimony

According to Detective McDermott, when he entered Lock's on March 7, 2012:

> There were several what appeared to be employees there.  Some of which were with customers, some without.  There was one individual that I happened to make eye contact with as I walked in.  I approach the counter and I took out my identification and told him that I was a New Jersey State Trooper.  And at that time, I handed him the photograph and asked him if he recognized this individual.

(Tr. 100:3-12)

18

* * * *

There was no response initially.  He took the photograph.  There were two other gentlemen that were within a couple feet.  They gathered around him and then the three kind of spoke amongst themselves, so I sat there and just observed them.  I didn't provide any information at that point.  And amongst the three of them, I overheard them say that they were certain that this gentleman – or sure that this gentleman had been in the store before and possibly purchased a firearm.  At that point, they summoned a female from an office that was just a few feet away, Mrs. Lock, Virginia Lock, and they asked her to come over.  They explained to her that they believed that we – obviously the photograph I had given them, they believe that that gentlemen had been in the store before and purchased a firearm.  And at that point, Mrs. Lock asked me to accompany her into her office, myself and Detective Etree (ph).  Once we went back to her office, there was another woman there, Jennifer Corn (ph).  Mrs. Lock introduced us, explained that one of the salesman had recognized the photograph.  And at that point, I provided Ms. Corn with the name Frank Maclaine and the date of birth, March 6th, 1946 and she used that information to access their computer database.  As they did, Mrs. Lock informed me that there had been three separate transactions regarding Mr. Maclaine in late March of 2008, April of 2008 and I believe later in April of 2008.

(Tr. 100:17-25; 101:1-17).

With respect to whether he ever told the employees at Lock's his reason for coming there,

Detective McDermott testified:

No . . . I think I might have mentioned to Mrs. Lock that this individual had actually had the phone number [for Lock's] saved in his phone and that's what brought me there.  But no, the gentleman at the counter, I don't believe I discussed anything about the investigation at all.

(Tr. 103:14-23).

* * * *

I'm sure just during the exchange I mentioned that I was a homicide detective and it could have come up that it actually was a homicide that we were investigating.

(Tr. 103:23-25; 104:1-6).

When asked if any of the three employees identified the person in the photograph by

name, Detective McDermott stated, "No, I don't believe so."  (Tr. 107:5-7).  Detective

19

McDermott further stated that it was not until Detective Etree and he were in the back office that *he gave Mrs. Lock the name of Frank Maclaine* and the biographical information.  (Tr. 107:13-23).  After he (Detective McDermott) provided that information, Lock's was able to run the record search.  (Tr. 107:24-25; 108:1).

### e.   Agent Serafino's Testimony

Agent Serafino testified that she went to Lock's in the beginning of April to obtain 4473s and was directed to Virginia Lock.  (Tr. 112:25; 113:1-4).  "I then provided her with the name and date of birth to look up in her database . . . she made photocopies of the documentation for me."  (Tr. 113:5-8).  Agent Serafino stated that she went to Lock's armed with two photographs she had acquired from the Pennsylvania driver's license database.  (Tr. 113:9-11). Agent Serafino testified that she showed Mrs. Lock the photographs and asked her if she recalled meeting with a NJ State trooper.  Mrs. Lock said she did.  (Tr. 114:7-14).  Agent Serafino further testified that Mrs. Lock's son John Lock was also asked to make identifications of the two photographs.  (Tr. 114:15-18).  She asked John Lock – after she obtained the 4473s – to identify the sales clerks on the three transactions occurring in 2008.  Agent Serafino stated that Mr. Lock was able to tell her this information and he said that he recognized the individual in the photographs.  (Tr. 115:1-8). One and a half to two weeks later, Agent Serafino testified that she went back to Lock's to do a follow-up interview with Dominic Folino.  (Tr. 115:21-25; 116:1-3).  Agent Serafino said that she had the 4473s and two photographs with her.  Mr. Folino said that he recognized the person in the photographs.  (Tr. 116:10-16).  A couple days later, Agent Serafino interviewed salesperson Jerry Dewan.  (Tr. 117:5-9).  Mr. Dewan did not recall the firearm transaction, nor did he recognize the individual in the two photographs.  (Tr. 117:15-21).

When asked why she did not show any of the employees a photo array, Agent Serafino testified "because per the conversation that I had with Detective McDermott, I was under the understanding that the individuals at Lock's had already identified Mr. Maclaine as being the individual who had come into the gun store to purchase firearms." (Tr. 118:7-15). Agent Serafino stated that it is fair to say that when she spoke with Detective McDermott, he did not say who at Lock's specifically identified Mr. McAleese. (Tr. 121:1-10). Agent Serafino admitted that when she went to Lock's, she "didn't know what individuals working at the store had or had not identified Mr. McAleese." (Tr. 121:11-14). And, it's "correct," Agent Serafino stated, that she didn't get a photo array to bring to the store, in spite of knowing this and the fact that she was attempting to get evidence in this case. (Tr. 121:15-18).

Agent Serafino continued her testimony by acknowledging that Virginia Lock never identified the person in the photograph by name when she first visited her at Lock's; and that she (Agent Serafino) actually provided Mrs. Lock with Mr. McAleese's name and date of birth. (Tr. 122:13-23). Agent Serafino also admitted that when speaking to John Lock on her first visit to the store, she did show him the 4473 with the photograph of Mr. Maclaine's license attached to it before showing him the photos for identification, (Tr. 124:3-16); and, she showed Mr. Lock a federal form that indicated he had sold a gun to Frank Maclaine before showing him the photographs. (Tr. 124:22-25; 125:1-3). After making a positive identification upon seeing the first photo, Agent Serafino believed Mr. Lock said the individual in the photo was Frank Maclaine. (Tr. 125:10-13). "Correct," Agent Serafino testified, that was after she had given Mr. Lock the form with Frank's name on it. (Tr. 125:13-15).

Towards the end of her testimony, Agent Serafino testified that before she interviewed the

Lock's employees, she identified herself and told them why she was there.  "They knew that I was following up on information that was provided by New Jersey State Police." (Tr. 125:16-23).  Agent Serafino further testified that she met Dominic Folino during her second trip to Lock's. (Tr. 125:24-25; 126:1).  Mr. Folino was shown the 4473 before she showed him the photographs. (Tr. 126:2-5).  Agent Serafino doesn't believe that Mr. Folino gave the name of the individual in the photographs, but she thinks he did say "that he recognized the individual as being somebody who had come into the store." (Tr. 126:10-14).

Finally, when asked if the store employees were as certain and positive when she met with them in the store as they were today with respect to the identification of Mr. McAleese, Agent Serafino stated, "They were certain that they recognized the individual in the photographs as being somebody who came into their store, yes." (Tr. 127:1-5).  As far as naming the person in the photos by name, Agent Serafino testified that "[t]hey may have." (Tr. 127:6-8).

### 2.     The Out-of-Court Identification Procedures Were Impermissibly Suggestive

It is clear from the testimonial record set forth above that the procedures used in this case in obtaining the identifications made by Mrs. Lock, Mr. Folino and Mr. Lock were impermissibly suggestive.  Factors relevant to this analysis include "the size of the array, the manner of its presentation by the officers, and the details of the photographs themselves."  United States v. Wiseman, 172 F.3d 1196, 1208 (10th Cir. 1999) (citation omitted); see also Reese v. Fulcomer, 946 F.2d 247, 260 (3d Cir. 1991).

The manner in which Detective McDermott and Agent Serafino conducted their respective photo "array" identifications was impermissibly suggestive.  Not only did Detective McDermott and Agent Serafino fail to take routine steps to minimize the suggestiveness of their

identification procedures, but their actions actually enhanced their procedures' suggestiveness. For example, with all three witnesses, Detective McDermott and Agent Serafino displayed photographs that only depicted Mr. McAleese and both discussed why they were at the store. Indeed, Mrs. Lock testified that Detective McDermott told her, as well as John and Dominic, that he was showing them the single photograph because the individual killed someone in New Jersey. (Tr. 50:12-16; 20-24). Mr. Folino remembered Detective McDermott telling him that the person in the photograph had committed a crime and that it was a criminal investigation. (Tr. 71:7-25). Taking it upon himself to find out why Detective McDermott was at the store, Mr. Lock testified that he said "Well, what did he do?" (Tr. 88:19-23). Mr. Lock believed Detective McDermott said "he stabbed someone to death." (Tr. 88:24-25). In fact, Detective McDermott himself admitted that he might have mentioned to Mrs. Lock that he was a homicide detective and that he was investigating a homicide. (Tr. 103:14-25; 104:1-6). Agent Serafino, on the other hand, testified that she told Mrs. Lock, Mr. Folino and Mr. Lock why she was at the gun store before interviewing them. "They knew that I was following up on information that was provided by New Jersey State Police," testified Agent Serafino. (Tr. 125:16-23).

This approach had at least two flaws. First, it clearly suggested to the witnesses that the individual in the photographs was wanted for something criminal. This is something the Department of Justice directs should be avoided. See United States Department of Justice, Office of Justice Programs, National Institute of Justice, Eyewitness Evidence: A Guide for Law Enforcement (1999) 32 ("Instruct the witness that the person who committed the crime may or may not be in the set of photographs being presented."). Indeed, Mr. Lock asked Detective McDermott, "Well, what did he do?" (Tr. 88:19-23). Second, the witnesses made an

identification based not on their memories of the individual depicted in the photograph, but out of fear that the individual had committed a crime with a gun purchased from their store. For sure, Mrs. Lock testified that although she didn't remember if she asked Detective McDermott if the individual had done it with one of her guns, that is something she would have been concerned about.  (Tr. 51:4-9).

Apart from the conduct of Detective McDermott and Agent Serafino that unnecessarily enhanced the suggestiveness of the identifications, the arrays themselves were impermissibly suggestive.  First, the array shown by Detective McDermott contained only one photograph; and Agent Serafino's array consisted of two photographs of the defendant – facts that strongly militate in favor of a finding of suggestiveness.  See Wiseman, 172 F.3d at 1209 (observing that "using as few as six photos in an array, while not per se a due process violation, is a factor affecting the weight we give to the irregularities in the array").  As the Supreme Court explicitly stated in Manson v. Braithwaite, "identification arising from single-photograph displays may be viewed in general with suspicion."  432 U.S. 98, 116 (1977) (citing Simmons v. United States, 390 U.S. 377, 383 (1968)); see also United States v. Hart, 2008 WL 1900145, at * 8 (E.D. Pa. April 2008) (citations omitted).  This problem is compounded in this case by the fact that only Mr. McAleese's  photograph was shown.  Mrs. Lock, Mr. Folino and Mr. Lock were not shown any other images of other individuals.  See United States v. Brownlee, 454 F.3d 131, 138 (3d Cir. 2006) ("no 'suspect' save Brownlee was presented to any of the eyewitnesses at any time").  The fact that only Mr. McAleese's image was presented by law enforcement for identification would automatically cause any reasonable person to infer – as Mrs. Lock, Mr. Folino and Mr. Lock did – that this person did something wrong.

In addition, there was no good reason why Detective McDermott and Agent Serafino failed to utilize less suggestive procedures, such as a properly-composed photo array or a line-up. Brownlee, 454 F.3d at 137, 138 (quoting United States v. Sebetich, 776 F.2d 412, 420 (3d Cir. 1985) ("stating that a line-up or similar procedure should 'be employed whenever necessary to ensure the accuracy and reliability of identifications'"). When asked on cross-examination why she didn't show Mrs. Lock, Mr. Folino and Mr. Lock a photo array [composed of more than two photographs], Agent Serafino testified "because per the conversation [she] had with Detective McDermott, [she] was under the understanding that the individuals at Lock's had already identified Mr. Maclaine as being the individual who had come into the gun store to purchase firearms." (Tr. 118:7-15). Admitting that Detective McDermott never actually told her who at Lock's specifically identified Mr. McAleese, (Tr. 121:1-10), Agent Serafino testified that she didn't bring a photo array to the gun store, in spite of the fact that she was attempting to get evidence in this case. (Tr. 121:15-18).

Agent Serafino also admitted that when speaking to Mr. Lock on her first visit to the store, she did show him the 4473 with the photograph of Mr. Maclaine's license attached to it before showing him the two photographs for identification, (Tr. 124:3-16); and, she showed Mr. Lock a federal form that indicated he had sold a gun to Frank Maclaine before showing him the photographs. (Tr. 124:22-25; 125:1-3). Agent Serafino testified that Mr. Lock positively identified the individual in the photos as Frank *after* she had given him the form with Frank's name on it. (Tr. 125:10-15).

Given the presentation of the arrays in this case, the Court should conclude that the arrays were impermissibly suggestive.

**3.**     **The Identifications Were Not Reliable Under The Totality Of The Circumstances.**

The identifications made by Ms. Lock, Mr. Folino and Mr. Lock, given the totality of the circumstances, were not reliable.  In Neil v. Biggers, the Supreme Court suggested five factors to be considered in evaluating the reliability of a witness' identification: (1) the opportunity of the witness to view the perpetrator at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the perpetrator; (4) the level of certainty demonstrated by the witness at the time of the confrontation; and (5) the length of the time between the crime and the confrontation.  409 U.S. 188, 199-200 (1972).  These factors support a finding that the identifications made by the witnesses in this case were not reliable.

First, neither Mrs. Lock, Mr. Folino nor Mr. Lock have had an opportunity to view Mr. McAleese since 2008, the year in which Mr. McAleese allegedly conducted the firearm transactions at Lock's.  Based on their testimony, Mrs. Lock had no interaction with Mr. McAleese in 2008; Mr. Folino interacted with him once, possibly twice; and Mr. Lock assisted Mr. McAleese with the return of a gun.  When asked if he remembered anything about that 2008 transaction, Mr. Lock testified that he recalled asking Mr. McAleese if he was related to a couple of boys he (Mr. Lock) went to school with, but besides that, he remembered nothing unusual about the transaction.  (Tr. 86:13-25; 87:1-20).  Provided the minuscule amount of time in which each of the witnesses had an opportunity to view Mr. McAleese four years ago, this factor does not support a finding of reliability.

The second factor – degree of attention – also supports Mr. McAleese's position that the identifications were not reliable.  Based on their inability to recall the most basic details about their encounters with Detective McDermott and Agent Serafino at the gun store in March and

April of 2012, it's not much of a stretch to infer that the degree of these witnesses' attention in 2008 was, at best, minimal.  Mrs. Lock, Mr. Folino and Mr. Lock were not victims of a crime, thus, they had no reason to scrutinize Mr. McAleese during these routine sale transactions. Indeed, the transactions with Mr. McAleese were nothing more than run of the mill transactions that Mrs. Lock, Mr. Folino and Mr. Lock conducted on a routine and frequent basis.  Indeed, Mr. Lock acknowledged that from 2008 to 2012, he has "absolutely" dealt with hundreds of gun transactions.  (Tr. 85:13-25; 86:1).  These facts would certainly impact the reliability of these witnesses' identifications.

The third factor – the accuracy of the witness' prior description – is not applicable in this case.  Neither Mrs. Lock, Mr. Folino nor Mr. Lock were required to give a description of Mr. McAleese prior to making their identifications.

The final two factors – the level of certainty demonstrated by the witness and the length of time between the crime and the confrontation – weigh heavily in favor of unreliability. Certainty does not ensure accuracy.  Nearly four years elapsed between the alleged firearm transactions by Mr. McAleese and the witnesses' identifications.  Notwithstanding, Mrs. Lock, Mr. Folino and Mr. Lock all testified with certainty that they recognized Mr. McAleese and, over and above this, they remembered that his name was Frank.  For instance, Mrs. Lock testified that when Detective McDermott showed her the photograph, she recognized the individual because he had returned a gun shortly after he purchased it in 2008, and that was highly unusual.  (Tr. 42:13-19).  Mrs. Lock further testified that she believed she gave Detective McDermott the individual's name when she identified him in the photograph.  (Tr. 48:22-25)  When asked by Agent Serafino if she could identify the individual in the photographs, Mrs. Lock recalled that

she responded Frank Maclaine.  (Tr. 52:12-20).

The most sure of all the witnesses, Mr. Folino testified that when Detective McDermott showed him the photograph and asked him if he recognized the individual, he responded that he did and that the male's name was Frank.  (Tr. 69:1-9).  "Without any hesitation, I remember his first name," Mr. Folino testified.  (Tr. 68:12-13).  However, when defense counsel brought to his attention that Detective McDermott wrote that the salesman at the counter was joined by two other employees and that they discussed amongst themselves whether they recognized the individual in the photograph, Mr. Folino testified that "that could be."  (Tr. 69:7-23).  Mr. Folino acknowledged that it was possible that a group formed and started looking at the photograph "after he positively identified Mr. McAleese."  (Tr. 70:4-9).  Mr. Folino testified that if his positive identification of Mr. McAleese was not included in Detective McDermott's report, it "[c]ould be" that the trooper just left it out.  (Tr. 70:10-12).  Mr. Folino also stated that he told Agent Serafino that he knew the person in the photographs she showed him; that the person had been in the store; and that he thought he had sold the person a gun.  (Tr. 73:9-14).

Like his colleagues, Mr. Lock testified that "[he] knew right away" who the individual in Detective McDermott's photograph was.  (Tr. 81:10-18).  Mr. Lock recalled that it was the customer who returned the firearm in 2008, (Tr. 82:4-6), and his name was Frank Maclaine.  (Tr.89:19-25; 90:1-2).  "I make it a point to remember people's names," Mr. Lock testified.  (Tr. 90:6).  Despite making it a point to remember the names of the people who come into the gun store, Mr. Lock testified that [Agent] "Mary Jane" asked him if he recognized the same pictures again, even though he had given the name and identified the photo already with the Jersey detectives.  (Tr. 90:19-25; 91:9-16).

28

In stark contrast to the testimony of Mrs. Lock, Mr. Folino and Mr. Lock, who claimed to be certain in their identifications, the testimony of Detective McDermott and Agent Serafino recalled these witnesses' uncertainty and initial inability to even recognize the individual in the photographs, let alone remember that individual's name.  Indeed, when asked on cross-examination if the government's identification witnesses were as certain and positive about the identity and name of the individual in the photographs back in April of 2012 as they were at the hearing today, Agent Serafino acknowledged that the their testimony today was somewhat different than her recollection of what took place in April 2012.  (Tr. 126:17-20).  Agent Serafino testified that Mrs. Lock, Mr. Folino and Mr. Lock "were certain that they recognized the individual in the photographs as being somebody who came in the store.  (Tr. 127:1-5).  However, with respect to actually identifying the individual in the photographs by name, Agent Serafino stated, "[t]hey may have."  (Tr. 127:6-8).  When posed with a similar question about whether these three witnesses identified the person depicted in the photograph by name in March 2012, Detective McDermott testified, "No, I don't believe so."  (Tr. 107:5-7). Detective McDermott further testified that he gave Mrs. Lock the name Frank Maclaine.  (Tr. 107:13-23).

Thus, considering all of the factors, the out-of-court identifications of Mr. McAleese from the photo arrays should not be deemed reliable.  Moreover, even if the identifications are deemed reliable under Biggers, their reliability is outweighed by the corrupting influence of the suggestive procedures employed in this case.  See Braithwaite, 432 U.S. at 114.

Finally, the in-court identifications of Mr. McAleese at the suppression hearing should not be permitted because they were unreasonably and permanently tainted by the highly suggestive procedures employed in conducting the earlier, out-of-court identifications.  This

court witnessed first hand this taint.  All three civilian witnesses expressed certainty as to their identifications both in-court and out-of-court at the store.  Yet all three were found to be categorically and materially wrong about almost every aspect as to what occurred during the out-of-court identifications in the store.  In this case, due to the highly inflammatory procedures utilized during the photographic identifications, the witnesses are certain *but they are not accurate.*  There is nothing that can remove this taint.  As this Court saw firsthand, these civilian witnesses are convinced they are correct – despite being completely wrong about almost every aspect of the photographic show ups.  The in-court identifications are unreliable and must also be suppressed.

**WHEREFORE**, for all the reasons set forth in the defendant's original suppression motions, for the reasons that unfolded at the suppression hearing on January 24, 2013, and for the reasons set forth above, Frank G. McAleese respectfully requests that the Court grant the motions and issue an order suppressing all the physical and identification evidence seized in this case.

Respectfully submitted,

*/s/ James J. McHugh, Jr.*
JAMES J. MCHUGH, JR.
Assistant Federal Defender

## CERTIFICATE OF SERVICE

I, James J. McHugh, Jr., Assistant Federal Defender, Federal Community Defender Office for the Eastern District of Pennsylvania, hereby certify that I have served a true and correct copy of Defendant's Post-Hearing Memorandum of Law in Support of Defendant's Motions to Suppress Physical Evidence and Out-of-Court and In-Court Identifications, upon Eric B. Henson, Assistant United States Attorney, by Electronic Case Filing and hand delivery to his office at the United States Attorney's Office located at 615 Chestnut Street, Suite 1250, Philadelphia, Pennsylvania 19106, on the date indicated below.


_/s/ James J. McHugh, Jr._____
JAMES J. MCHUGH, JR.
Assistant Federal Defender


Date:  March 5, 2013