**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| v. | : | **CRIMINAL NO. 12-239-01** |
| **FRANK G. McALEESE** | : | |
| a/k/a "Frank George McAleese" | | |
| a/k/a "Frank E. MacLaine" | | |
| a/k/a "Frank Eastwood MacLaine" | : | |

**GOVERNMENT'S SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTIONS TO SUPPRESS**

The United States of America, by Zane David Memeger, United States Attorney for the

District, and Eric B. Henson, Assistant United States Attorney, as permitted by the Court

respectfully submits this supplemental memorandum in opposition to defendant Frank G.

McAleese's motions to suppress physical evidence and in-court identifications. For the reasons

previously argued and those which follow, the government urges the Court to deny the motions.

**I.      Introduction**

The defendant Frank G. McAleese, a convicted murderer, is charged by indictment with

three counts of providing false information to a federal firearms licensee, in violation of 18

U.S.C. § 922(a)(6); three counts of making a false statement to a federal firearms licensee, in

violation of 18 U.S.C. § 924(a)(1); and four counts of possession of a firearm by a convicted

felon, in violation of 18 U.S.C. § 922(g)(1). These charges arise from McAleese's sales and

purchases of handguns at a Philadelphia gun shop, transactions that are regulated under federal

law and records of which are required by law to be maintained by the gun shop.

McAleese seeks suppression of his cell phone and a stored cell phone record of the gun shop's phone number found on the phone seized under search warrants issued in a New Jersey murder investigation. As a hearing has clarified, at issue in the motion to suppress based on putative defects in the search warrants are warrants to search McAleese's car (Government's Exhibit 7 at the suppression hearing)[1] and the cell phone that was seized in that search (Government's Exhibit 8). McAleese also seeks suppression of the evidence developed at the gunshop after the transactions came to light in the murder investigation and of in-court identifications of him by store employees with whom he made these transactions.

At the conclusion of a hearing on these motions, the Court permitted the parties to file supplemental memoranda of law in light of the hearing record. This memorandum is submitted with respect pursuant to that permission.

## II.    Supplemental Argument

### A.  Factual Background

Detective Sergeant Francis McGovern

Detective Sergeant McGovern has been employed by New Jersey State Police about 12 or 13 years, became a detective in 2003, and was promoted to detective sergeant in 2010. Transcript January 24, 2013 (Tr.) 14. The sergeant participated in the Carol Brown murder investigation in Woodstown, Salem County, New Jersey, beginning November 9, 2011. Tr. 15. He obtained a warrant (Government Exhibit 7) to search a Taurus belonging to McAleese and found near the victim's apartment. Tr. 15, 18. First Assistant prosecutor William Brennan of

---

[1] The government believes that it supplied the Court copies of its exhibits and will not encumber this filing by attaching copies. Copies will be supplied the Court's chambers on request. The documents have been supplied the defense in discovery and again at the hearing.

Salem County Prosecutor's office reviewed the probable cause affidavit and warrant and arranged for Sgt. McGovern to meet with New Jersey Superior Court Judge Timothy Farrell. Tr. 15-16. At about 10:14 a.m. on November 10, 2011, Sgt. McGovern swore to the warrant before Judge Farrell who approved it. Tr. 16, 19.

McAleese's Taurus had been towed and secured for execution of the warrant pursuant to standard protocol when a warrant is sought for movable things, specifically motor vehicles, to conserve police resources and to ensure that the vehicle will not be tampered with and will not be accessed by anyone not authorized to do so. Tr. 17, 20-21. Whether or not written, this has been standard procedure as long as Sgt. McGovern has been a detective. Tr. 22. The search of the Taurus produced a Cricket telephone and personal items of McAleese, including photographs.

Detective II Dennis Quinn

Detective Quinn has been employed by the New Jersey State Police for eight years and achieved the rank of Detective II in September 2010. Tr. 24-25. In the Brown murder investigation, he obtained two search warrants (Government Exhibits 8 (cell phones) and 9 (residence)). Tr. 24-25. The cell phone warrant was issued by New Jersey Superior Court Judge Samuel D. Natal on November 15, 2011. Tr. 26, 28, 38. The prosecutor's office set up the meeting with Judge Natal after reviewing the warrant. Tr. 26-27.

The warrant affidavit erroneously stated that McAleese's Cricket phone was found in the victim's Hyundai when it was found in McAleese's Taurus. Tr. 30-31, 37. Compare Exhibit 8 at paragraph H of the affidavit. The affidavit was prepared according to the detective's understanding at the time; he was not then aware of the typographical error. Tr. 30, 35.

<u>Detective I Harold McDermott</u>

Detective McDermott is a 12-year veteran of the New Jersey State Police, has been a detective seven years, and has been assigned to the Major Crime Unit for three. Tr. 97. He searched McAleese's cell phone and found phone number saved under "Lock's" with a 215 area code. Tr. 97-98. The number stored in the phone was the published business number for Lock's Philadelphia Gun Exchange. <u>Id.</u>

On March 7, 2012, Detective McDermott went to Philadelphia in a general canvas for background information. He had a photograph (Government Exhibit 1) of McAleese, who was known to him and to Lock's as Mclaine (as this alias is spelled in the transcript), which had been seized in the search of McAleese's car. Tr. 99, 104. At Lock's, the detective took the photo to a person he made eye contact with, showed his police identification, handed the person the photo, and asked if he recognized the man. Tr. 100. Three men looked at the photo and spoke among themselves, and at least one said they were certain or sure that McAleese had been in the store before and possibly purchased a firearm. Tr. 100-01, 107. Detective McDermott did get the names of the persons who viewed the photo but believes that Dominic Folino may have been the person to whom he first handed McAleese's photo. Tr. 105-06. The detective does not recall describing the crime he was investigating while at Lock's. Tr. 103-04.

Mrs. Lock was summoned and told that they believed McAleese had been in the store and purchased a firearm. Tr. 101. Mrs. Lock took McDermott to the office, away from the three men, where a secretary used McAleese's identifying information to find records of his three gun purchases in March and April 2008. Tr. 101, 107-09. Detective McDermott did not ask Mrs. Lock if she recognized McAleese because his purpose was to look into Lock's records copies of

which he took.  Tr. 102.  Nor did he question the men about how they remembered McAleese.

Tr. 108.  McDermott gave the Lock's information about McAleese's firearms transactions to

ATF.  Tr. 102.

Special Agent SarahJane Serafino

Special Agent Serafino is assigned to ATF's Philadelphia Field Office and has been an

agent for five and a half years.  Tr. 110-12.  Detective McDermott told her that several people

had recognized McAleese's photo as someone who had come into Lock's gun shop in the past.

Tr. 111-12, 123.  She thus knew that McAleese, a convicted felon, may have illegally purchased

firearms at Lock's.  Tr. 119-20.  She interviewed Lock's employees before receiving any written

reports from the New Jersey State Police.  Tr. 112.  She understood that Mrs. Lock had identified

McAleese but did not know exactly which employees had identified him.  Tr. 120-21.

In the beginning of April 2012, she went to Lock's to get firearms transaction records and

met with Virginia Lock, the owner, at the gun shop.  Tr. 112-13.  As in all her interviews at

Lock's, she interviewed Mrs. Lock alone, identified herself, and said that she was following up

on the information they had given Detective McDermott.  Tr. 125, 128.  She gave Mrs. Lock

McAleese's name and date of birth information and was given photocopied documentation of the

transactions.  Id.  The agent took two photographs (Government Exhibits 1 and 2) of McAleese

to the shop.  Tr. 113.  She chose the two photos because each was under one of two names

associated with McAleese.  Tr. 128.

After confirming that Mrs. Lock met with a New Jersey state trooper, Special Agent

Serafino showed her Exhibit 2 and asked if she recognized it.  Mrs. Lock said she recognized the

individual, McAleese.  Tr. 114.  Agent Serafino then showed Mrs. Lock Exhibit 3, and Mrs.

Lock said Exhibit 3 was a more accurate depiction of the individual she recalled coming into the shop.  Id.  John Lock was not in the room when Mrs. Lock viewed the photos.  Id.  On this visit, Lock reviewed the record of the transaction he had with McAleese, who as on all the transaction records was identified by name, "Mclaine," and Lock also identified for the agent the Lock's employees who had made sales to McAleese.  Tr. 115, 124-25.  Lock himself recognized McAleese's photo and also said that Exhibit 3 was more accurate.  Id.  No one prompted Lock to identify either photograph.  Id.

A week and a half or two weeks later, Agent Serafino returned to the gun shop to interview the two additional sales clerks.  Tr. 115-16.  She next interviewed Dominic Folino alone.  Tr. 116.  She showed Folino a firearm transaction record, and he identified his signature on the document and confirmed that he made the firearm transaction.  Id.  She then showed him Exhibit 2 and he said that he recognized McAleese.  Id.  When showed Exhibit 3, he said that the darker hair was more accurate of the person who made the transaction.  Id.  Folino did not hesitate in his identification.  Tr. 117.  She does not recall showing Folino Exhibit 1.  Tr. 117.

Several days later she interviewed Jerry Dewan.  Tr. 117.  Dewan identified his signature on a firearm transaction record but did not recall the transaction, although attached to the 4473 was a copy of the Pennsylvania photo identification that was presented at the time of the transaction and matched Exhibits 2 and 3.  Tr. 117.  Dewan did not recall the person in the photographs.  Tr. 118.

Agent Serafino did not show the Lock's employees photo arrays because she understood from her conversation with Detective McDermott that the individuals at Lock's had already identified McAleese as the individual who had come into the gun store to purchase firearms.  Tr.

118, 120.  She later showed the witnesses a black and white photo of McAleese during a witness preparation, and they recalled seeing the photo before but did not indicate that they had to rely on it in saying whether or not they remembered the person who was involved in the transaction.  Id.  Each witness declared that she or he would recognize McAleese in person and were certain they recognized McAleese as someone who came into the gun shop.  Tr. 118-19, 127.  Dewan, however, said that he did not recall the person even after seeing the photographs and the identification photograph that was attached to the record of his transaction with McAleese.  Tr. 119.

Virginia Lock

Virginia Lock owns Lock's Philadelphia Gun Exchange as its sole proprietor.  Tr. 39. She employs John Lock and Dominic Folino.  Id.  In court she positively, certainly, and unequivocally identified McAleese as a customer of her gun shop.  Tr. 40.  She recognizes McAleese not from his gun purchases but from when he brought guns back because she processed the repurchase of the guns.  Tr. 57, 58-59.  Highly unusually McAleese returned firearms so Mrs. Lock remembered him.  Tr. 41-42.

Mrs. Lock recalled a New Jersey State Trooper inquiring about McAleese and showing her a picture of him, and she said she recognized McAleese, who looked very familiar to her.  Tr. 40-41.  She pulled firearms transaction records (Government Exhibits 4, 5, and 6) for sales on March 21, April 9, and April  22, 2008.  Tr. 41-42.  She also remembered recognizing McAleese in a photograph shown her by Detective McDermott (Exhibit 1), whom she told McAleese looked familiar and that she recognized him.  Tr. 42-43, 44, 46.  On that occasion, she recalled McAleese by the name he used during the transactions, Mclaine.  Tr. 48.  She was shocked to

learn that McAleese had killed someone in New Jersey. Tr. 50. Mrs. Lock also recalled recognizing the photographs shown her by Agent Serafino (Exhibits 2 and 3). Tr. 42-43, 52. She saw McAleese's identification photograph when she reviewed the transactions paperwork before giving it to the agent. Tr. 56. She again recalled McAleese when she saw his photograph during witness preparation. Tr. 57-58. She recalls McAleese and identified him in court from his returning firearms, not from the photographs she has seen. Tr. 58.

John Lock

John Lock, the son of Mrs. Lock, has worked at the Philadelphia Gun Exchange since 1982. Tr. 79. In court Lock positively and unequivocally identified McAleese from having waited on him in 2008 Tr. 79-80, 86. Lock remembers him calling up and saying he wanted to return a gun the day after he bought it. Tr. 80, 82, 93. Buy-backs happen, but not that often, and multiple buy-backs are unusual. Tr. 80, 94-95. Lock also recalls that he went to school with a couple of boys with the same last name, Mclaine, and asked McAleese if he was related to them and McAleese said no, he was from South Jersey. Tr. 86. He recalls no one else giving Mclaine's name at the store. Tr. 90. Lock has been in the store all his life and "make[s] it a point to try to remember people's names . . . people appreciate that when they come in . . . feel welcomed in the store." Id.

Although Lock had identified photographs of McAleese before, he did not rely on them for his in court identification. Tr. 84, 91-92. Although McAleese has changed, is thinner and older, he is the same person who came in the store. Tr. 84. Lock immediately knew who McAleese was when shown a photograph by Detective McDermott. Tr. 81, 82, 89. Only after Lock had recognized the customer did the trooper say that what McAleese had done. Tr. 88.

<u>Dominic Folino</u>

Dominic Folino, a 32-year Philadelphia Police veteran who retired in 2003, has worked off and on at Lock's since 1983. Tr. 60. In court he positively and unequivocally identified McAleese as someone he had contact with at Lock's when he sold McAleese a firearm whom he recognized immediately despite the passage of time as the same person Folino recalls selling a gun to. Tr. 62, 65, 77. McAleese impressed Folino by his arrogant demeanor, and Folino recalls that McAleese provided a maritime license in addition to his driver license, the only time Folino recalls seeing such identification. Tr. 61, 66. During the transaction, McAleese supplied the photo identification, a copy of which is attached to the transaction record (Exhibit 4), and Folino compared the customer to the photograph. Tr. 62-63. Folino believes that he started another transaction with McAleese. Tr. 72-73.

In 2012, a New Jersey state trooper identified himself to Folino and asked him if he recognized the person in a photograph (Exhibit 1), and Folino recognized the photo as he did also two photographs (Exhibits 2 and 3) shown him by Agent Serafino. Tr. 64-65, 73. Folino positively identified McAleese's photographs. Tr. 70. He believes that Mrs. Lock also identified a photograph but does not recall if she gave a name, nor does he recall any other identification. Tr. 70-71.

## B.  **Securing McAleese's Car**

The defense has contended that the New Jersey State Police violated McAleese's Fourth Amendment rights when they moved his car to secure it while awaiting a warrant to search it. This contention is based on an inapplicable doctrine, impoundment for community caretaking. This doctrine applies in a "noncriminal" context, not in the context here of a murder

investigation in which the police have probable cause to search the perpetrator's car for evidence. The seizure of the evidence at issue was not pursuant to the impoundment and inventorying of the car but to the probable cause that existed to search it and the search warrant issued on a judge's finding of probable cause. The police had probable cause to search the car and therefore the authority to maintain superintendence over it until they had searched it. There was never any thought of impounding the car and inventorying it.

In its initial memorandum on the motion to suppress physical evidence, the government established that the police had probable cause to search McAleese's car. They chose to do so pursuant to a warrant but could as well have relied on their right to search a car without a warrant based on probable cause. The automobile exception to the warrant requirement permits law enforcement officers to seize and search an automobile without a warrant if "probable cause exists to believe it contains contraband." Pennsylvania v. Labron, 518 U.S. 938, 940 (1996). Although a warrantless search of property ordinarily requires a showing of both probable cause and exigent circumstances, the "ready mobility" of automobiles permits their search based only on probable cause. See Maryland v. Dyson, 527 U.S. 465, 466-67 (1999); Labron, 518 U.S. at 940. The Supreme Court has recognized that, where there is probable cause to search a vehicle, there is no difference between seizing and holding a car pending a probable cause determination by a magistrate and carrying out an immediate search without a warrant, as "either course is reasonable under the Fourth Amendment." Chambers v. Maroney, 399 U.S. 42, 52 (1970). The automobile exception "allows warrantless searches of any part of a vehicle that may conceal evidence . . . where there is probable cause to believe that the vehicle contains evidence of a crime." Karnes v. Skrutski, 62 F.3d 485, 498 (3d Cir. 1995) (quoting United States v. McGlory,

968 F.2d 309, 343 (3d Cir. 1992)).  Under the automobile exception, where there is probable

cause to search, there is no requirement that the search occur contemporaneously with the seizure

of the vehicle.  See United States v. Johns, 469 U.S. 478, 487 (1985) (warrantless search of

closed containers found in vehicle three days after a lawful seizure of the vehicle was reasonable

because vehicle could have been searched immediately); United States v. Gastiaburo, 16 F.3d

582, 586 (4th Cir. 1994) ("justification to conduct a warrantless search under the automobile

exception does not disappear merely because the car has been immobilized and impounded").

Because the detectives here had probable cause to believe there was evidence in

McAleese's car, they were permitted to enter and search it immediately under the automobile

exception.  Moving the car and obtaining a search warrant was certainly no greater intrusion than

a (lawful) warrantless search would have been.  And moving the car did not extinguish the

probable cause to search it.  Suppressing evidence, as the defense requests, because the detectives

took a cautious approach would be an unwarranted application of the exclusionary rule.

The impoundment of the car, in any case, was proper.  Sgt. McGovern testified that the

police followed a well-established procedure which has been in place as long as he has been a

detective.[2]  When a warrant is to be obtained to search a vehicle, the vehicle is towed and

impounded to conserve police resources and secure the car from tampering and access by

unauthorized persons.  Tr. 21-22.  By analogy to more intrusive procedures - impounding and

inventorying the contents of a car without probable cause or reasonable suspicion to search it -

---

[2] The sergeant believed that there is a written standard operating procedure covering this
established practice.  The government has not to date received a written procedure covering this
circumstance.  This is immaterial under the law discussed below, even if "caretaking"
impoundment procedures were required here despite probable cause to search the car and the
decision to search it only after obtaining a warrant.

that have been upheld when probable cause is lacking, the procedure followed here surely did not violate McAleese's Fourth Amendment rights.

"The Fourth Amendment does not require that every search be made pursuant to a warrant. It prohibits only unreasonable searches and seizures." South Dakota v . Opperman, 428 U.S. 364, 372-73 (1976). Warrantless "inventories pursuant to standard police procedures are reasonable" and therefore do not violate the Fourth Amendment. Id. at 372. Specifically, the Opperman Court held the contents of cars taken into police custody may be inventoried without a warrant, probable cause, or reasonable suspicion. Id. at 375-76 (holding that inventory of contents of locked car, including inventory of unlocked glove compartment where police officers discovered marijuana, was not an unreasonable search). The Court ruled that inventory searches occur in a "noncriminal context" and serve three main purposes: (1) protection of an owner's property while it is in police custody; (2) protection of the police from claims of lost, stolen, or vandalized property; and (3) protection of the police from danger. Id. at 369, 371 n.5. The Supreme Court and courts of appeals have continued to recognize the validity of inventory searches. See Florida v. Wells, 495 U.S. 1, 3-4 (1990) (holding that inventory searches can involve the opening of containers found inside the car); Colorado v. Bertine, 479 U.S. 367, 371 (1987) (noting that "inventory searches are now a well-defined exception to the warrant requirement of the Fourth Amendment" and holding that narcotics found inside metal canisters contained in nylon bag inside backpack found directly behind the front seat of a van during an inventory search were admissible); United States v. Morris, 179 Fed. Appx. 825, 827 (3d Cir. 2008) (noting that the inventory search exception is well-established); United States v. Lopez, 547 F.3d 364, 369-70 (4th Cir. 2008); United States v. Grossman, 233 Fed. Appx. 963, 967-68

(11th Cir. 2007) (same); <u>United States v. Mendez</u>, 315 F.3d 132, 137 (2d Cir. 2002) (same);

<u>United States v. Sholola</u>, 124 F.3d 803, 818 (7th Cir. 1997) (same).

To be valid, an inventory search must be "conducted according to standardized criteria or established routine." <u>Bertine</u>, 479 U.S. at 374 n.6. Formalized, written standards are not necessary, so long as there is an established procedure for conducting an inventory search. <u>United States v. Frank</u>, 864 F.2d 992, 1002 (3d Cir. 1988). Further, the standardized criteria or established routine governing inventory searches must limit a police officer's discretion regarding (a) whether to search a seized car and (b) the scope of an inventory search. <u>United States v . Salmon</u>, 944 F.2d 1106, 1120 (3d Cir. 1991). "The mere fact that an inventory search may also have had an investigatory purpose does not . . . invalidate it." <u>Id.</u> at 1001 (holding that search of car, including search of zippered garment bag found in locked trunk, was proper inventory search even though officer also had investigatory motive). It follows that the impoundment procedure here, which applies when the police intend to seek judicial authority to search the vehicle, does not violate the Fourth Amendment. The motion to suppress McAleese's cell phone must be denied.

**C. <u>Searching McAleese's Telephone</u>**

In its initial response to the motion to suppress physical evidence, the government established the validity of the warrants at issue despite the omission from each of the date of the murder under investigation. At the hearing, the defense relied also on a previously unspecified error in the warrant to search McAleese's cell phone, Exhibit 7. In the affidavit of probable cause, the phone is said erroneously to have been seized not from McAleese's car but from the victim's. Exhibit 8 at paragraph H. of the affidavit of probable cause. <u>Compare</u> Exhibit 7

(inventory) and Tr. 34. This error was unwitting, not reckless, much less purposeful. Tr. 35. In fact, the affiant was plainly unaware of the error until asked about it at the hearing. The error was also not material because when corrected the affidavit is clearly valid.

In <u>Franks v. Delaware</u>, 438 U.S. 154 (1978), the Supreme Court held that where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and the allegedly false statement is necessary to the finding of probable cause, then the Fourth Amendment requires that a hearing be held at the defendant's request. If the defendant is then able to prove his allegation of perjury or reckless disregard at the hearing, the false material in the warrant must be excised, and the court must determine whether the remaining content is sufficient to establish probable cause. <u>Franks</u>, 438 U. S. at 155-56. The Third Circuit has extended the <u>Franks</u> analysis to omissions as well as misstatements. <u>See</u> <u>Wilson v. Russo</u>, 212 F.3d 781 (3d Cir. 2000); <u>Sherwood v. Mulvihill</u>, 113 F.3d 396, 399 (3d Cir. 1997); <u>United States v. Frost</u>, 999 F.2d 737, 743 n.2 (3d Cir. 1993) (collecting cases). In <u>Wilson</u>, the court explained that omissions are made with reckless disregard "if an officer withholds a fact in his ken that '[a]ny reasonable person would have known that this was the kind of thing the judge would wish to know.'" <u>Wilson</u>, 212 F.3d at 788 (citation omitted). In evaluating a claim such as McAleese's, therefore, "[t]he test for determining materiality is to insert the facts recklessly omitted and determine whether the 'corrected' warrant establishes probable cause." <u>Id.</u> at 787 (citation omitted).

Here, if McAleese is accorded the benefit of a materiality analysis, despite the absence of knowing or reckless falsity, it is clear that the warrant is valid. When the fact that the phone was

14

seized from McAleese's car is supplied, probable cause is not arguably lacking. Even if the erroneous statement that the phone was seized from the victim's car is deleted but no additional information supplied, the warrant remains valid because the seizure of the phone pursuant to a warrant in the murder investigation gives probable cause to search it to establish its number, contact information, and the like. The immaterially erroneous statement about where the phone was found does not warrant suppression of the information on it about McAleese's association with Lock's.

The motion must be denied, in any case, because the police acted in good faith on the warrant. See Messerschmidt v. Millender, 132 S. Ct. 1235, 1249 (2012) ("On top of all this, the fact that the officers sought and obtained approval of the warrant application from a superior and a deputy district attorney before submitting it to the magistrate provides further support for the conclusion that an officer could reasonably have believed that the scope of the warrant was supported by probable cause."). The Third Circuit has explained that:

> The good faith exception instructs that suppression of evidence "is inappropriate when an officer executes a search in objectively reasonable reliance on a warrant's authority." [United States v.] Williams, 3 F.3d [69,] 74 [(3d Cir. 1993)]. "The test for whether the good faith exception applies is 'whether a reasonably well trained officer would have known that the search was illegal despite the magistrate [judge's] authorization.' " [United States v.] Loy, 191 F.3d [360,] 367 [(3d Cir. 1999)(quoting Leon, 468 U.S. at 922 n. 23 []). The mere existence of a warrant typically suffices to prove that an officer conducted a search in good faith and justifies application of the good faith exception. Leon, 468 U.S. at 922 []; Williams, 3 F.3d at 74. Yet there are situations in which an officer's reliance on a warrant would not be reasonable and would not trigger the exception. Leon, 468 U.S. at 922-23 []. Our Court has identified four such situations:
>
> > (1) [when] the magistrate [judge] issued the warrant in reliance on a deliberately or recklessly false affidavit;
> >
> > (2) [when] the magistrate [judge] abandoned his judicial role and failed to perform his neutral and detached function;

> (3) [when] the warrant was based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;' or
>
> (4) [when] the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.
>
> Williams, 3 F.3d at 74 n. 4 (citations omitted).

United States v. Hodge, 246 F.3d 301, 307-08 (3d Cir. 2001) (footnote omitted). None of these situations is present here. There was no deliberate or reckless falsity, the judge did not abandon his judicial role, the warrant was not patently lacking in probable cause, and the warrant was not facially deficient. The motion to suppress the Lock's contact information on McAleese's phone therefore fails.

It bears repeating that, as the Supreme Court has emphatically stated, "The fact that a Fourth Amendment violation occurred -- i.e., that a search or arrest was unreasonable -- does not necessarily mean that the exclusionary rule applies. Indeed, exclusion 'has always been our last resort, not our first impulse,' and our precedents establish important principles that constrain application of the exclusionary rule." Herring v. United States, 555 U.S. 135, 140 (2009) (citations omitted). The Court continued: "We have repeatedly rejected the argument that exclusion is a necessary consequence of a Fourth Amendment violation. Instead we have focused on the efficacy of the rule in deterring Fourth Amendment violations in the future." Id. at 141 (citations omitted). The Court has determined that evidence will be excluded only where the deterrence benefit of that action outweighs its substantial cost (i.e., letting a criminal go free). The Court has specified that the balance favors exclusion only where the authorities engaged in "deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." Id. at 144. None of those circumstances are present here.

As the telephone and its contact information are admissible, the extraordinary and extreme nature of the ultimate remedy sought by the defense - exclusion of the illegal transactions and the records Lock's was required by law to maintain of these transactions and the owner and employees' recollections of the transactions and actor - is apparent. See United States v. Crews, 445 U.S. 463, 475 (1980) ("The exclusionary rule enjoins the Government from benefitting from evidence it has unlawfully obtained; it does not reach backward to taint information that was in official hands prior to any illegality."); see also United States v. White, 326 F.3d 1135, 1140 (10th Cir. 2003). See INS v. Lopez-Mendoza, 468 U.S. 1032 (1984) (the defendant may not suppress his identity); United States v. Garcia-Beltran, 443 F.3d 1126 (9th Cir. 2006); United States v. Roque-Villanueva, 175 F.3d 345 (5th Cir. 1999).

**D. The Identifications**

In-court identifications are excluded from evidence at trial only if so patently unreliable that permitting a jury to consider them would deny due process. Cf. United States v. Sebetich, 776 F.2d 412, 420 (3d Cir. 1985) (affirming the denial of a lineup; the reliability of eyewitness testimony is a jury issue). Here at the motions hearing the witnesses demonstrated the independence and reliability of their identifications of McAleese. Each declared her or his identification positive and independent of the photographs they were shown. Each had her or his distinctive reasons for remembering McAleese as a customer of the gun shop. Factors which may potentially cloud one's ability to recall a face, such as relatively fleeting glimpses under the stress of extreme fear in cross-racial confrontations, were not present. Each witness dealt with McAleese during commercial transactions when the opportunity to observe him were good and the reasons each had to remember him strong. These witnesses had no motive, such as to punish

someone who had wronged them, to falsely claim an ability to identify McAleese. And each cogently and persuasively explained why she or he remembered McAleese from his firearms transactions, not from seeing photographs.

To be sure, these identifications will be subject to sharp cross-examination at trial. For example, about four years passed from the transactions to the first out-of-court identifications. But the presence of circumstances for testing the identifications before the jury is not a reason to deny the jury the opportunity to evaluate the witnesses. The defense cannot establish that the identifications are so unreliable that the jury will be incapable of applying the Court's instructions on identification evidence to these witnesses. The defense burden is to establish that the photographic displays here were so distorting of the witnesses' independence of mind that their identifications cannot be believed as a matter of law. Their testimony at the hearing refuted any such notion.

Though McAleese's photographs were not placed in arrays for the witnesses to view, this was for no invidious reason. Detective McDermott was not seeking to establish whether or not any employee of McAleese could identify him in the murder case. He was looking for background information and knew only that McAleese had an association with the gun shop which was reflected in his telephone contact list. The detective sought to learn and asked not whether the person in the photograph had committed a crime at the shop but whether he was recognized there as a patron. The detective did nothing that suggested that he would be pleased, much less reward the owner or salesmen, if McAleese were recognized. Having learned that McAleese was both recognized and had made firearms purchases there, he did not inquire further about the identifications. The only "suggestive" circumstance was the showing of a single

photograph. The witnesses were not, however, affected in their recognition of McAleese by this circumstance.

When Special Agent Serafino went to the gun shop, she understood that McAleese had been identified by the shop's personnel and by the records of his firearms transactions there. She took McAleese's photographs not to establish his identity for the first time but to confirm what she understood was an established fact. The witnesses were not overborne by her showing the photographs; each later confirmed their ability to identify McAleese face-to-face and the bases of their identifications in having dealt with him as a customer. Their assertions of the independent natures of their identifications is confirmed by Jerry Dewan's inability to identify McAleese. Agent Serafino took the same approach with Dewan that she had with the owner and other employees. Although McAleese's photograph was attached to the record of Dewan's sale of a firearm to him (Government Exhibit 5), Dewan was unable to recall McAleese, felt no incentive, much less obligation, to do so, and told the agent that he could not identify McAleese as a customer. Nothing in the agent's conduct would have induced or coaxed an inaccurate or disingenuous identification from the witnesses who testified at the hearing.

Each witness immediately recognized McAleese in court and withstood cross examination about their identification. Mrs. Lock recalled McAleese because quite unusually he resold guns to the shop, transactions she authorized. Lock also recalled the unusual nature of McAleese's transactions, and he recalled a conversation with McAleese about the coincidence of the name McAleese used and name of acquaintances and McAleese's response that he was from South Jersey. Lock makes a point of recalling customers' names. Folio recalls McAleese because of his arrogant manner and his use of a maritime license during the sale Folino made.

There is no reason to believe that these witnesses are self-deceived, much less deceiving, in their claims under oath to recognize McAleese from the transactions at issue in this case. The motion to exclude their in-court identifications should be denied.

## III.    <u>CONCLUSION</u>

The Court should deny defendant's motion to suppress the witnesses' in-court identifications.

Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney


s/ Maureen Mc Cartney for
KATHY A. STARK
Chief, Violent Crime and Firearms Section


s/ Eric B. Henson
ERIC B. HENSON
Assistant United States Attorney

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this day I caused a copy of the Government's Supplemental Memorandum in

Opposition to Defendant's Motion to Suppress to be served by electronic filing to:

> James J. McHugh, Jr., Esquire
> Defender Association, Federal Division


> s/ Eric B. Henson_____
> ERIC B. HENSON
> Assistant United States Attorney

Date: March 5, 2013