IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 12-239-1 |
| | : | |
| FRANK G. MCALEESE | : | |

**DEFENDANT'S FINAL MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTIONS TO SUPPRESS PHYSICAL EVIDENCE
AND OUT-OF-COURT AND IN-COURT IDENTIFICATIONS**

Defendant, Frank G. McAleese, through undersigned counsel, hereby submits this Final Memorandum of Law in support of the motions to suppress filed in this matter. For the reasons set forth in the defendant's previous pleadings, for the reasons that unfolded at the suppression hearing on January 24, 2013, and for the reasons set forth below, Mr. McAleese's motions should be granted in their entirety. All of the challenged physical evidence, as well as the in-court and out-of court identifications, must be suppressed.

**A.    Decades of Fourth Amendment Law Refute the Government's Argument That the Evidence Obtained from Lock's Philadelphia Gun Exchange Is Not the Fruit of the Unlawful Search of the Ford Taurus and Cricket Phone**

Detective Harold McDermott of the New Jersey State Police testified unequivocally that the *only* reason he went to Lock's Philadelphia Gun Exchange ("Lock's) was as a result of the search of defendant's Cricket cellular telephone and the recovery of the name Lock's accompanied by a phone number. This phone was seized from defendant's car, the Ford Taurus, after the police had seized and towed the car without a warrant and then searched the car with an invalid warrant. Detective McDermott conceded that, prior to the search of the car and phone, he

1

had no evidence of any kind linking the defendant to Lock's. Since the search of the car and, thereafter, the search of the cell phone were illegal, the well established fruit of the poisonous tree doctrine first established in Wong Sun v. United States, 371 U.S. 471 (1963), requires suppression of all evidence recovered at Lock's.

The ATF 4473 forms and all other evidentiary items obtained from Lock's cannot be used by the government in its case-in-chief. The recovery of this evidence was the direct result of the earlier violations of Mr. McAleese's constitutional rights.

> The Government cannot violate the Fourth Amendment . . . and use the fruits of such unlawful conduct to secure a conviction. *Nor can the Government make indirect use of such evidence for its case, or support a conviction on evidence obtained through leads from the unlawfully obtained evidence.* All of these methods are outlawed, and convictions obtained by means of them are invalidated, because they encourage the kind of society that is obnoxious to free men.

Walder v. United States, 347 U.S. 62, 64-65 (1954) (Frankfurter, J.) (emphasis added, citations omitted).

In the landmark case of Wong Sun, the Supreme Court held that evidence obtained by "exploitation" of illegal actions by the police is "fruit of the poisonous tree" and subject to the exclusionary rule. A bedrock principle of the exclusionary rule is that it applies to derivative as well as direct evidence obtained through an unlawful search. Alone, this single principle dooms the government's argument: that even if the Court finds there was insufficient probable cause to search the Taurus and suppresses the Cricket phone and the data found therein, the Court may still allow the government to admit the ATF 4473 forms and other evidence obtained from Lock's.

The application of the exclusionary rule to derivative evidence – evidence obtained not

*during* an unlawful search or seizure, but later – began with the seminal case of Nardone v. United States, 308 U.S. 338 (1939). Since then, it has become a basic tenet of Fourth Amendment law. As Justice Scalia, has explained for the Court:

> The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search, and of testimony concerning knowledge acquired during an unlawful search. *Beyond that, the exclusionary rule also prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search*, up to the point at which the connection with the unlawful search becomes "so attenuated as to dissipate the taint."

Murray v. United States, 487 U.S. 533, 536-37 (1988) (emphasis added, citations omitted).[1]

Indeed, the metaphor of the "fruit of the poisonous tree" was developed precisely to reflect the derivative reach of the exclusionary rule. Unlike in cases involving evidence found during an unlawful search or seizure, "[i]n the typical 'fruit of the poisonous tree' case, the challenged evidence was acquired by the police *after* some initial Fourth Amendment violation." United States v. Crews, 445 U.S. 463, 471 (1980).

To avoid suppression under the exclusionary rule, the government must prove that the evidence has been purged of the taint of illegality through an exception to the exclusionary rule, i.e. inevitable discovery, independent source, attenuation, or good faith. See Wong Sun, 371

---

[1] Accord New York v. Harris, 495 U.S. 14, 18-19 (1990) ("the indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality."); Segura v. United States, 468 U.S. 796, 804 (1984) ("Under this Court's holdings, the exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.' "); Nix v. Williams, 467 U.S. 431, 441 (1984) ("[T]he exclusionary rule applies not only to the illegally obtained evidence itself, but also to other incriminating evidence derived from the primary evidence."); Wong Sun, 371 U.S. at 484 ("The exclusionary prohibition extends as well to the indirect as the direct products of [unlawful] invasions.").

3

U.S. 487-88; United States v. Pelullo, 173 F.3d 131, 136 (3d Cir.), cert. denied, 528 U.S. 824 (1999). None of these exceptions apply in this case.

The police violated the Fourth Amendment rights of Mr. McAleese when they seized and searched his Ford Taurus. But for these constitutional violations, the police would not have discovered the phone located inside the driver's side door of the Taurus. Had the phone not been recovered and searched, the telephone number for Lock's would not have been discovered. Without the discovery of the Lock's telephone number, the police would never have initiated contact with the owner and employees of Lock's.

Indeed, Detective McDermott testified that the *only reason* he even went to Lock's was because of the phone number retrieved from the Cricket phone:

| | |
|---|---|
| Pros. Henson: | In the course of that investigation, did you visit the gun shop in Philadelphia called Lock's Philadelphia Gun Exchange? |
| Det. McDermott: | I did sir. |
| Pros. Henson; | And how did it come about that you made that visit? |
| Det. Mcdermott: | My visit to Lock's Gun Exchange came about after a cell phone belonging to Mr. Mcclaine had been collected during the search warrant of his vehicle. |

NT at 97.

| | |
|---|---|
| Attorney McHugh: | I wanted to go back to the couple of questions. The *only reason* you went to Lock's was because of that phone number in the phone; is that correct? |
| Det. McDermott: | Correct, sir. |
| Attorney McHugh: | There was *no other* piece of evidence in your investigation of the New Jersey homicide that indicated *anything* about the Lock's gun shop, is that right? |
| Det. McDermott: | That's correct, sir. |

4

NT at 104.  (Emphasis added.)

Absent any contact with the Lock's employees, the police would never have obtained the ATF 4473 forms, identifications, sale invoices and other evidence relating to Mr. McAleese's alleged purchase and return of firearms four years earlier in 2008.  The ATF 4473 forms and other evidence obtained from Lock's were recovered as a direct result of the unlawful search of the cell phone, and the cell phone was recovered as a direct result of the unlawful seizure and search of the Ford Taurus.  The ATF 4473 forms and all other Lock's evidence must be suppressed as derivative evidence that were the direct result of the unlawful seizure and search of the Ford Taurus and the cell phone.  See Wong Sun, 371 U.S. at 484; Murray, 487 U.S. at 536-37.  Moreover, none of the exceptions to the exclusionary rule apply here to purge the taint of these illegal actions.

> **1.)** **The Independent Source, Inevitable Discovery, Attenuation and  Good Faith Exceptions Do Not Apply**

"The independent source, inevitable discovery, and attenuation doctrines recognize that where the causal link between the constitutional violation and the later-revealed evidence is tenuous or, indeed, non-existent, the later-revealed evidence can be said to be untarnished by the constitutional violation and therefore may be admissible." United States v. Pelullo, 173 F. 3d 131, 136 (3rd Cir. 1999).

There is a direct causal link, in this case, between the illegal seizure and search of the car and phone and the recovery of the evidence at Lock's.  The fact that the evidence at Lock's was not protected by privacy interest is irrelevant and the government's argument on this point fails. Wong Sun makes no such rule for evidence to be considered a fruit, rather as Justice Scalia stated

5

for the Court: "the exclusionary rule . . . prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search . . ." Murray v. United States, 487 U.S. 533, 536-37 (1988).

## I. Independent Source

The Supreme Court's decision in Segura v. United States, 468 U.S. 796 (1984), best describes a situation where evidence would not be suppressed as a fruit since an "independent source" leading to the evidence existed. In Segura the police illegally entered a residence with a valid warrant. The Court found that the valid warrant contained information obtained from an independent source – completely separate from the illegal entry – that established probable cause and which was known to the police *well before* the invalid entry into the residence. Applying a "but for" test the Court concluded that the police had already legally discovered evidence of criminality prior to the illegal entry and therefore under the "but for" test the evidence was not a fruit.

The Segura facts are distinguishable from the facts in this case. Here the police had absolutely no knowledge of any criminality by the defendant at Lock's prior to the illegal search of the car and the phone. The evidence the police had concerning the New Jersey murder indicated nothing about a gun being involved. Rather, both Search Warrants indicated the decedent died from blunt force trauma to the back of her head as the result of an assault. Govt. Ex. 7 at ¶5 and Govt. Ex. 8 at ¶5. Furthermore, there was no "independent source" of information that would have led police to Lock's to investigate gun purchases made by the defendant – in a different state (Pennsylvania) some four years earlier.

6

## II. Inevitable Discovery

The Supreme Court's decision in Nix v. Williams, 467 U.S. 431 (1984), best describes a situation where evidence would not be suppressed as a fruit under the "inevitable discovery" exception. In Nix a young girl went missing and the police picked up the defendant and interrogated him. During this interrogation the defendant confessed to the murder and told the police where the body of the decedent was located - and the police did in fact locate the body. The interrogation was eventually ruled illegal and the defense moved for suppression of all evidence recovered at the scene where the body was recovered. The Nix Court noted that – *prior* to the defendant's interrogation and admission – a search party of some 200 volunteers had been combing the area where the decedent's body was eventually discovered. The Court held that the evidence recovered from the body was not a fruit, finding that the decedent's body would inevitably have been discovered by the search party.

The Nix facts are clearly distinguishable from the facts in this case. There is no evidence, whatsoever, supporting the conclusion that the police would have inevitably discovered the Lock's evidence. The evidence the police had concerning the New Jersey murder indicated nothing about a gun being involved. Rather, both Search Warrants indicated the decedent died from blunt force trauma to the back of her head as the result of an assault. Govt. Ex. 7 at ¶5 and Govt. Ex. 8 at ¶5. Four years had passed since the alleged purchase of the guns; yet the Lock's evidence had not been discovered. Finally, but-for the illegal recovery of the Lock's phone number in the cell phone the police would never have gone to Lock's and discovered any evidence there.

### III. Attenuation

It is well settled that the fruit of the poisonous tree doctrine will not apply in a case where "the discovery of the challenged evidence has become so attenuated as to dissipate the taint." Nardone v. United States, 308 U.S. 338 (1939). In analyzing this exception courts will look for the presence of an intervening circumstance of significance or a break in the chain of events. See e.g., Dunaway v. New York, 442 U.S. 200 (1979); Jarvis v. United States, 435 U.S. 934 (1978). This Court will essentially need to decide whether the Lock's evidence had been discovered or obtained "by exploitation of [the] illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Wong Sun v. United States, 371 U.S. 471, 488 (1963).

Here there is simply no "intervening circumstance" or a "break in the chain of events" of any legal or factual significance between the officer's illegal seizure of the Lock's name and phone number and the trip to the Lock's store where the evidence was recovered. See e.g., United States v. Molt, 444 F. Supp. 491 (E.D. Pa. 1978)(Ditter, J.)(the seizure of evidence was not sufficiently attenuated to dissipate the agent's illegal questioning since no independent information was used in the warrant that was gained – in the interim – between the questioning and seizure.) The recovery of the Lock's evidence occurred only because of the illegality and not by means "distinguishable" from the primary taint. The "attenuation" exception does not apply here.

### IV. The Good Faith Exception

In United States v. Leon, 468 U.S. 897 (1984), the Supreme Court held that when police officers reasonably rely on a search warrant issued by a neutral and detached magistrate, which is later found to be defective, the evidence obtained as a result should not be excluded.

Suppression remains a remedy, however, in four circumstances, two of which are applicable in this case: (1) where the magistrate issued the warrant in reliance on a deliberately or recklessly false affidavit; and (2) when the affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. United States v. Zimmerman, 277 F.3d 426, 427 (3d Cir. 2002) (citing United States v. Hodge, 246 F.3d 301, 308 (3d Cir. 2001); Leon, 468 U.S. at 923).

In addition, the law is clear that the good faith exception does not apply when an affidavit fails to establish the timeliness of the information contained within it. Indeed, because it is uniformly recognized that the omission of the date or time in which the alleged criminal activity transpired is a serious defect in the affidavit, several courts have held that good faith is not applicable. United States v. Doyle, 650 F.3d 460 (4th Cir. 2011), is one example. In Doyle, the affidavit in support of the warrant alleged that Doyle had shown nude pictures of young children to the informant's step-nephew. Id. at 472. However, the affidavit provided no information regarding when Doyle showed the pictures to the step-nephew. Id. at 474.

Recognizing that an affidavit must provide evidence of recent criminal activity at the place to be searched, the Doyle court opined that "the *only* critical date was the date when Doyle allegedly showed Victim 1 a nude photograph. As that date was omitted, there was nothing on which a reasonable officer could rely to conclude that a sufficiently limited period of time had elapsed to justify the search." Doyle, 650 F.3d at 476, n.18 (emphasis in original). Because the evidence offered in the affidavit was so deficient, the Fourth Circuit found that "it was unreasonable to believe that probable cause was demonstrated to search Doyle's home given the complete absence as to when the pictures were possessed." Id. at 474. Accordingly, the court

9

held that "because reliance on the warrant was not objectively reasonable, . . . the good faith exception recognized in Leon is inapplicable." Id. at 476.

The affidavits for the Ford Taurus and the Cricket cell phone made it impossible for the issuing judge to do anything more than rubber stamp the affiant's own conclusions. Not only did the affidavits provide insufficient evidence from which an independent assessment of probable cause to believe that evidence relating to the murder investigation would be found within Mr. McAleese's Ford Taurus and his Cricket phone, but they also failed to identify the date of the murder and failed to establish a basis upon which a date could be inferred. Indeed, there is nothing in either affidavit from which the date of the murder can be determined and accordingly there was no way for the issuing judge to determine, based on the four corners of the warrant, whether the information was stale. Because "a reasonably well-trained law enforcement officer should be familiar with the fundamental legal principle that both the 'commission' and 'nexus' elements of 'probable cause' include an essential temporal component," United States v. Zayas-Diaz, 95 F.3d 105, 114-15 (1st Cir. 1996), the good-faith exception to the exclusionary rule is not available in the present case under the standard enunciated in Leon. Indeed, reasonably well-trained officers – as the detectives involved in this case are assumed to be – would have known that more was needed to establish probable cause to search the Ford Taurus and the Cricket.

Finally, the police reliance on a warrant is not objectively reasonable when the warrant is based on a deliberately or recklessly false or incomplete affidavit, as is the case here with the Cricket phone. Leon, 469 U.S. at 923. "Suppression [ ] remains an appropriate remedy if the . . . judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth. Leon, 468

U.S. at 923 (citing <u>Franks v. Delaware</u>, 438 U.S. 154 (1978)).

The Application for Search Warrant for the Cricket was based on a reckless misrepresentation. In sworn testimony before the Court on January 24, 2013, Detective Quinn conceded that his averment in paragraph H of his affidavit – <u>i.e.</u>, the Samsung "Cricket" cellular telephone was found in the vehicle where the murder was committed – was incorrect. NT at 35-36. Detective Quinn acknowledged that the New Jersey State Police Crime Scene Evidence Log showed that the Cricket cell phone was actually recovered from the Ford Taurus and that paragraph H of his affidavit was completely erroneous. NT at 35 . Most importantly, Detective Quinn's reckless error formed the sole basis for the probable cause to issue the warrant for the Cricket. The good faith exception is not applicable to this matter.

**B.** **The Search Warrants for the Ford Taurus and Cricket Cellular Telephone Did Not Contain False Statements made by the Defendant or Allegations of False Statements by the Defendant**

The government repeatedly asserted at oral argument that probable cause supporting the search warrants for the Ford Taurus and Cricket phone was established by the presence of false statements made by the defendant that were presumably contained in the Search Warrants. This argument is meritless.

**1.)** **The Search Warrant for the Taurus did not Contain False Statements**

The Search Warrant and the Application for Search Warrant for the Ford Taurus were prepared by Detective McGovern. Detective McGovern specifically described in the Application for Search Warrant his extensive experience as a lead investigator for many criminal investigations. Govt. Ex. 7 at ¶1. He also described extensive training that he had received over the years in all aspects of law enforcement and criminal investigations. <u>Id.</u> Despite this

11

extensive experience and training, Detective McGovern made no assertion, whatsoever, in any part of the Search Warrant or Application for Search Warrant that the defendant, Frank McAleese, lied to the authorities at any time during this investigation.

Indeed, Detective McGovern specifically listed the crimes that he believed were supported by probable cause and he did not mention lying to the authorities. Id. at ¶5G. Furthermore, Detective McGovern testified at the suppression hearing. He was never asked by the government about any false statements allegedly made by the defendant, nor did he testify that the defendant had made any false statements to the authorities.

A review of the Application for Search Warrant belies the government's contention. On the night in question, it is averred that the defendant told the police that the decedent left her apartment complex in her car to go to the "Corner Bar" to "buy drugs." Govt. Ex. 7 at page 4-7, ¶5B. When she did not return in an hour, the defendant stated he walked to the "Corner Bar" to look for her. Id. A neighbor of the decedent, Anna Pansena, was interviewed and she supported this statement by the defendant. Specifically, she said she looked out the window and saw Ms. Brown's car gone but the defendant's vehicle "remained." Id. at ¶5E.

**2.) The Search Warrant for the Cricket did not Contain False Statements by the Defendant**

The Search Warrant and the Application for Search Warrant for the Cricket cellular telephone were prepared by Detective Quinn. Detective Quinn, like Detective McGovern, specifically described in the Application for Search Warrant his extensive experience as a lead investigator for many criminal investigations. Govt. Ex. 8 at ¶1. He also described extensive training that he had received over the years in all aspects of law enforcement and criminal

investigations.  Id.  Despite this extensive experience and training, Detective Quinn, like Detective McGovern, made no assertion, whatsoever, in any part of the Search Warrant or Application for Search Warrant that the defendant, Frank McAleese, lied to the authorities at any time during this investigation.  Detective Quinn, like Detective McGovern, specifically listed the crimes that he believed were supported by probable cause and he too made no mention of defendant lying to the authorities.  Id. at ¶5H.   Furthermore, Detective Quinn, like Detective McGovern, testified at the suppression hearing.  He was never asked by the government about any false statements allegedly made by the defendant, nor did he testify that the defendant had made false statements to the authorities.

Finally, a review of the Application for Search Warrant belies the government's contention.  On the night in question, it is averred that the defendant told the police that the decedent left her apartment complex in her car to go to the "Corner Bar" to "buy drugs."  Govt. Ex. 8 at page 3-6, ¶5B.  When she did not return in an hour, the defendant said he walked to the "Corner Bar" to look for her.  Id.  A neighbor of the decedent, Anna Pansena, was interviewed and she supported this statement by the defendant.  Specifically, she said she looked out the window and saw Ms. Brown's car gone but the defendant's vehicle "remained." Id. at ¶5E.

Thus, a careful and thorough review of the Search Warrants for the Ford Taurus and the Cricket cell phone, as well as the testimony at the hearing, establishes unequivocally that there is no evidence that the defendant made a false statement on the night in question.  Finally, the government did not even allege in the Application for Search Warrant for the car or the cell phone that the defendant made false statements.

## C. The Search Warrant for the Cricket Cellular Telephone Was Overly Broad

The Fourth Amendment instructs that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularity describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. See also Massachusetts v. Sheppard, 468 U.S. 981, 988 n.5 (1984). The particularity requirement ensures that a citizen is not subjected to a "general, exploratory rummaging in [his personal] belongings," Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971).

The Fourth Amendment also requires that a warrant be no broader than the probable cause on which it is based. "[A]n overbroad warrant 'describe[s] in both specific and inclusive terms what is to be seized,' but it authorizes the seizure of items as to which there is no probable cause." United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents, 307 F.3d 137, 149 (3d Cir. 2002).

The warrant for the Cricket cell phone was overbroad. It allowed for the seizure of "[a]ll information stored in the telephone" without any limitations that the information in anyway be reasonably connected to the murder investigation. Gov. Ex. 7 ¶ 1, pp. 1-2 of 3. Rather, the information authorized to be searched for, and seized, was unlimited. Not surprisingly, the officer did exactly what the warrant improperly authorized. He conducted an overbroad and wide ranging search – essentially a fishing expedition for any evidence of any crime he could find.

"I opened up the phone and powered the phone on and physically navigated through the phone and recorded down all the data that was saved within the phone. The logs regarding outgoing calls, incoming calls, missed calls, text messages and all the stored contacts within the phone at the time." NT at 98. This rummaging through a person's phone and all of the personal

content it contains simply cannot be condoned by this Court.[2]

D.      **The Seizure and Search of Defendant's Ford Taurus Were Illegal**

The impoundment of a vehicle is a seizure under the Fourth Amendment. United States v. Smith, 790 F.2d 789, 792 (9th Cir. 1986). Thus, in order to pass Fourth Amendment scrutiny, "[a]n impoundment must either be supported by probable cause, or be consistent with the police role as 'caretaker' of the streets *and completely unrelated to an ongoing criminal investigation.*" United States v. Duguay, 93 F.3d 346, 352 (7th Cir. 1996)(emphasis added)(citing South Dakota v. Opperman, 428 U.S. 364, 370 n.5 (1976)). The decision to impound must adhere to standardized criteria or established routine. See id. at 351. (quoting Florida v. Wells, 495 U.S. 1, 4 (1990)).

Detective McGovern testified that the Ford Taurus, was parked in a parking space at an apartment complex away from the scene of the crime. NT at 19. And, *prior to* the issuance of the search warrant, it was towed by the police approximately fifty miles to Troop A headquarters in Buena Vista, New Jersey. NT 19-20. Detective McGovern further testified that the vehicle was seized and towed pursuant to standard police practice/procedure/protocol. NT 17, 21. He described the purpose of this practice/procedure/protocol as follows:

> "If you have *evidence of a crime*, with movable property such as a motor vehicle, sometimes applying for a search warrant . . . can take hours or days . . . in order to best secure *the evidence* of movable property, we . . . move the vehicle to a secured location like a sally port or secured garage and it does a number of things. It ensures the security of the vehicle that nobody can have access to the vehicle and it also is a manpower issue. If we keep a motor vehicle in an unsecured area,

---

[2]The government does not and cannot argue that this search was a lawful search incident to arrest since the phone was not on the defendant's person at the time of the arrest. Rather, it was recovered in the Ford Taurus which was parked back at the apartment complex where the decedent resided.

15

then we have to post either a trooper or detective on that vehicle *to maintain chain of custody.*"

NT at 21. (Emphasis added). Certainly, this practice/procedure/protocol has nothing to do with the police's role as "caretaker of the streets" and everything to do with furthering the ongoing criminal investigation. For this reason alone, this police practice/procedure/protocol cannot provide the basis for a lawful warrantless seizure.

Indeed, it is not even clear that this practice/procedure/protocol exists. Detective McGovern could not be sure of whether this "standard practice" was written or not. NT at 22. He testified that he "believed" there was a written SOP but he could not "cite it to my recollection at this point." NT at 22.

He did, however, testify unequivocally that there was "a book of New Jersey State Police SOPs." Id. He also testified that he or another detective could make them available to the defense "promptly later today or tomorrow." NT at 24. The prosecutor also assured this Court and counsel that he would "inform Your Honor's deputy clerk if there's *any reason* why I can't get anything responsive from the New Jersey State Police with respect the standard operating procedure question tomorrow or Monday." NT at 131. (Emphasis added.)

Despite these assurances that written SOPs exist, are easily accessed, and would be provided promptly, none have been provided to the Court or the defense. Furthermore, the prosecutor has not given "any reason" for this failure to produce these SOPs. The warrantless seizure of the Taurus was illegal. All evidence recovered thereafter were fruits of the poisonous tree and it must be suppressed.

**E.     Conclusion**

The searches of the Ford Taurus and the Cricket cellular telephone were illegal. These searches violated defendant's Fourth Amendment rights, and the Court should suppress the direct and indirect evidence recovered as a result of these illegal searches as "fruit of the poisonous tree."

Respectfully submitted,

*/s/ James J. McHugh, Jr.*
JAMES J. MCHUGH, JR.
Assistant Federal Defender

**CERTIFICATE OF SERVICE**

      I, James J. McHugh, Jr., Assistant Federal Defender, Federal Community Defender Office for the Eastern District of Pennsylvania, hereby certify that I have served a true and correct copy of the Defendant's Final Memorandum of Law in Support of Motions to Suppress Physical Evidence and Out- of -Court and In-Court Identifications, upon Eric B. Henson, Assistant United States Attorney, by electronic case filing and hand delivery to his office at the United States Attorney's Office located at 615 Chestnut Street, Suite 1250, Philadelphia, Pennsylvania 19106, on the date indicated below.

                                          /s/ *James J. McHugh, Jr.*
                                          JAMES J. MCHUGH, JR.
                                          Assistant Federal Defender

DATE:       April 16, 2013