IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| v. | : CRIMINAL NO. 12-239-01 |
| FRANK G. McALEESE<br>    a/k/a "Frank George McAleese"<br>    a/k/a "Frank E. MacLaine"<br>    a/k/a "Frank Eastwood MacLaine" | :<br><br><br>: |

### GOVERNMENT'S MOTION FOR RECONSIDERATION OF COURT'S ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS

The government respectfully requests reconsideration of this Court's ruling suppressing evidence. The evidence at issue -- the testimony of the employees of Lock's, a federal firearms licensee, and the records of Lock's -- is sufficiently attenuated from the illegality identified by the Court that the exclusionary rule should not apply to this evidence. This result is made clear by binding Supreme Court precedent which the government failed to cite earlier, but which should be followed. In particular, the decision in United States v. Ceccolini, 435 U.S. 268 (1978), is on point, and directs denial of the motion to suppress in this case.[1]

---

[1] A motion for reconsideration is permitted where "(1) there has been an intervening change in the law; (2) new evidence has become available; or (3) reconsideration is necessary to prevent clear error or a manifest injustice." American Civil Liberties Union v. Mukasey, 534 F.3d 181, 188 (3d Cir. 2008) (citations omitted). Here, the legal error at issue is clear, and correction is therefore required.

In apology to the Court for this inconvenience, we can only take comfort in the famous words of Justice Frankfurter: "wisdom too often never comes, and so one ought not to reject it merely because it comes late." Henslee v. Union Planters Nat. Bank & Trust Co., 335 U.S. 595, 600 (1949) (Frankfurter, J., dissenting). Here, the interests of justice require that the error be corrected.

1

**Background**

The search at issue occurred in the course of an investigation of Frank McAleese for the murder of his girlfriend, Carole Brown. On the night in question, McAleese, who was intoxicated, arrived at an emergency room driving Brown's Hyundai. Brown was in the passenger seat, with severe blunt trauma to the back of her head. McAleese was covered in blood.

The police obtained a warrant to search not only the Hyundai, but also McAleese's Ford Taurus, which was parked "haphazardly" at another location, in front of Brown's apartment. A neighbor at that location reported that an hour before McAleese arrived at the emergency room, she heard Brown arguing in the parking lot of the apartment complex with a person she assumed was McAleese.

In searching the Ford Taurus, the police found a "Cricket" cell phone belonging to McAleese. They obtained another search warrant to search all contents of the phone. In that search, they identified a contact entry for Lock's, a Philadelphia firearms dealer. Four months later, a detective went to Lock's, and ultimately developed evidence, from store records and witness statements, that McAleese, a convicted felon, bought and sold firearms there using a different identification. This information provided the basis for the federal charges in this case, of making false statements to acquire firearms, possession of firearms by a convicted felon, and other offenses.

In ruling on the motion to suppress, this Court found that there was probable cause to search the Ford Taurus, though it said this was a close question, and rested its conclusion on the deference due to the issuing judge. The Court found, however, that the search of the phone

found in the Ford Taurus was inappropriate. Notably, the affidavit for the warrant to search the phone contained a significant factual error: it stated that the phone was found in the Hyundai, where the murder likely occurred, not in the Ford. At the suppression hearing, the detective-affiant said this was an unintentional "typo." The Court found otherwise, stating that even if the error was not intentional, it was a misstatement of fact that the detective had reason to know was false.

The Court further found that, while there may have been reason to search a phone found in the Ford Taurus for evidence of McAleese's relationship with the victim, there was no basis for an exhaustive search of all data in the phone, including all contacts.

Finally, the Court held that the evidence obtained from Lock's was directly linked to the illegal search, in that the records and testimony would not have been located but for the search of the phone. The Court concluded:

> For the above reasons, we find that search of McAleese's Cricket cellular phone violated his Fourth Amendment rights in that it was conducted pursuant to a warrant based upon an affidavit containing a material falsehood made with reckless disregard for its veracity. Were it not for this illegal search, the police would never have visited Lock's or obtained the transaction records and identification testimony they seek to admit at trial. We find that this evidence is tainted by the unlawful search, and therefore grant the Defendant's motion to suppress.

Mem. op. at 20.

## Discussion

The government accepts for purposes of this motion the Court's conclusion that the search of McAleese's cell phone was unlawful, based on its finding of an absence of probable cause in the warrant. However, the particular evidence at issue -- the testimony of Lock's employees, and the records of Lock's -- should not be suppressed. That evidence is sufficiently

attenuated from the police error at issue that the purposes of the exclusionary rule are not sufficiently served.

It is a fundamental rule that "[t]he fact that a Fourth Amendment violation occurred - i.e., that a search or arrest was unreasonable - does not necessarily mean that the exclusionary rule applies. Indeed, exclusion 'has always been our last resort, not our first impulse,' and our precedents establish important principles that constrain application of the exclusionary rule." Herring v. United States, 555 U.S. 135, 140 (2009) (citations omitted). In Herring, the Court continued: "the exclusionary rule is not an individual right and applies only where it 'result[s] in appreciable deterrence.' We have repeatedly rejected the argument that exclusion is a necessary consequence of a Fourth Amendment violation. Instead we have focused on the efficacy of the rule in deterring Fourth Amendment violations in the future." Id. at 141 (citations omitted).

In part, the Supreme Court reaffirmed, "the benefits of deterrence must outweigh the costs. 'We have never suggested that the exclusionary rule must apply in every circumstance in which it might provide marginal deterrence.' '[T]o the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against [its] substantial social costs.'" Id. (citations omitted). "The principal cost of applying the rule is, of course, letting guilty and possibly dangerous defendants go free . . . ." Id.

The attenuation doctrine, declining application of the exclusionary rule where the procurement of the evidence is sufficiently attenuated from the primary illegality, is a product of these principles. See, e.g., New York v. Harris, 495 U.S. 14, 22 (1990) ("Because deterrence is a principal purpose of the exclusionary rule, our attenuation analysis must be driven by an

understanding of how extensive exclusion must be to deter violations of the Fourth Amendment.").

Most pertinently, in United States v. Ceccolini, 435 U.S. 268 (1978), the Court required broad application of the attenuation principle with regard to witness testimony that is identified as the result of a Fourth Amendment violation. The government neglected to cite this dispositive case to this Court earlier, and we regret the error. However, justice requires and the government requests that this Court's error in light of Ceccolini be corrected.

In Ceccolini, the Supreme Court held that "the exclusionary rule should be invoked with much greater reluctance where the claim is based on a causal relationship between a constitutional violation and the discovery of a live witness than when a similar claim is advanced to support suppression of an inanimate object." Id. at 280. In a case on all fours with the present matter, the Court held that the lower courts erred in excluding witness testimony, even though an illegal search was the direct cause of identifying the witness. Ceccolini reveals that this Court's conclusion, that the witness testimony is excludable simply as a "but for" product of the unlawful search,[2] is incorrect.

In Ceccolini, an officer on his break spent time chatting with Lois Hennessey, an employee of a flower shop. During that time, he noticed an envelope lying on the cash register, with money sticking out of it. The officer looked in the envelope, and saw "policy slips," which were evidence of gambling activities. Without telling Hennessey what he had seen, he asked her

---

[2] This Court stated: "These witnesses were not known to the police prior to the unlawful search, and their cooperation would not have been secured without it. Were these employees permitted to testify, their presence in court would be directly attributable to a Fourth Amendment violation. Such testimony is therefore tainted and must be suppressed." Mem. Op. at 19.

to whom the envelope belonged, and she replied that the envelope belonged to Ceccolini, and that he had instructed her to give it to someone else. The officer passed the information along to local detectives, who in turn informed the FBI. Id. at 270.

Four months later, an FBI agent interviewed Hennessey, and she confirmed the events that occurred during her conversation with the officer. Id. at 272.

Defendant Ceccolini denied before a grand jury that he was involved in gambling, and when indicted for perjury, he moved to suppress Hennessey's testimony as the product of an illegal search of the envelope at the flower store. The district court granted that motion, and the appellate court affirmed, reasoning that "the ongoing investigation would not have inevitably led to the evidence in question without [Officer] Biro's discovery of the two policy slips." Id. at 273.

The Supreme Court accepted this factual conclusion, but reversed. It stated that it is "perfectly clear, if indeed ever there was any doubt about the matter, that the question of causal connection in this setting, as in so many other questions with which the law concerns itself, is not to be determined solely through the sort of analysis which would be applicable in the physical sciences. The issue cannot be decided on the basis of causation in the logical sense alone, but necessarily includes other elements as well." Id. at 274.

The Court rejected the proposition that "the testimony of a live witness should not be excluded at trial no matter how close and proximate the connection between it and a violation of the Fourth Amendment." Id. at 274-75. However, the Court concluded, "at least in a case such as this, where not only was the alleged 'fruit of the poisonous tree' the testimony of a live witness, but unlike Wong Sun the witness was not a putative defendant, an examination of our cases persuades us that the Court of Appeals was simply wrong in concluding that if the road

were uninterrupted, its length was immaterial. Its length, we hold, is material, as are certain other factors enumerated below to which the court gave insufficient weight." Id. at 275 (emphasis in original; referring to Wong Sun v. United States, 371 U.S. 471 (1963)).

The Court explained that, given the enormous societal cost of application of the exclusionary rule, the Supreme Court has insisted that the rule is only applied where its remedial objectives are most directly served. "Even in situations where the exclusionary rule is plainly applicable, we have declined to adopt a '*per se* or "but for" rule' that would make inadmissible any evidence, whether tangible or live-witness testimony, which somehow came to light through a chain of causation that began with an illegal arrest." Id. at 276.

The Supreme Court also expounded on these views at length in Hudson v. Michigan, 547 U.S. 586 (2006), stating in part:

> In other words, exclusion may not be premised on the mere fact that a constitutional violation was a "but-for" cause of obtaining evidence. Our cases show that but-for causality is only a necessary, not a sufficient, condition for suppression. . . . [E]ven if the illegal entry here could be characterized as a but-for cause of discovering what was inside, we have "never held that evidence is 'fruit of the poisonous tree' simply because 'it would not have come to light but for the illegal actions of the police.'" Segura v. United States, 468 U.S. 796, 815 (1984). See also id., at 829 (STEVENS, J., dissenting) ("We have not . . . mechanically applied the [exclusionary] rule to every item of evidence that has a causal connection with police misconduct"). Rather, but-for cause, or "causation in the logical sense alone," United States v. Ceccolini, 435 U.S. 268, 274 (1978), can be too attenuated to justify exclusion, id., at 274-275.
>
> . . . .
>
> Attenuation also occurs when, even given a direct causal connection, the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained. "The penalties visited upon the Government, and in turn upon the public, because its officers have violated the law must bear some relation to the purposes which the law is to serve." Ceccolini, supra, at 279.

Michigan v. Hudson, 547 U.S. at 592-93.

In Ceccolini, turning to the situation before the Court, it observed, first, that the willingness of the witness to testify is a significant factor. "The greater the willingness of the witness to freely testify, the greater the likelihood that he or she will be discovered by legal means and, concomitantly, the smaller the incentive to conduct an illegal search to discover the witness." Id.[3]

Next, the Court stated:

> Another factor which not only is relevant in determining the usefulness of the exclusionary rule in a particular context, but also seems to us to differentiate the testimony of all live witnesses—even putative defendants—from the exclusion of the typical documentary evidence, is that such exclusion would perpetually disable a witness from testifying about relevant and material facts, regardless of how unrelated such testimony might be to the purpose of the originally illegal search or the evidence discovered thereby. Rules which disqualify knowledgeable witnesses from testifying at trial are, in the words of Professor McCormick, "serious obstructions to the ascertainment of truth"; accordingly, "[f]or a century the course of legal evolution has been in the direction of sweeping away these obstructions." C. McCormick, Law of Evidence § 71 (1954).

Ceccolini, 435 U.S. at 277. "In short, since the cost of excluding live-witness testimony often will be greater, a closer, more direct link between the illegality and that kind of testimony is required." Id. at 278.

The Court determined that, on the facts before it, suppression of the testimony of witness Hennessey was not permitted:

> The evidence indicates overwhelmingly that the testimony given by the witness was an act of her own free will in no way coerced or even induced by official authority as a result of Biro's discovery of the policy slips. Nor were the slips

---

[3] The Court cautioned: "Of course, the analysis might be different where the search was conducted by the police for the specific purpose of discovering potential witnesses." Id. at 276 n.4.

8

> themselves used in questioning Hennessey. Substantial periods of time elapsed between the time of the illegal search and the initial contact with the witness, on the one hand, and between the latter and the testimony at trial on the other. While the particular knowledge to which Hennessey testified at trial can be logically traced back to Biro's discovery of the policy slips both the identity of Hennessey and her relationship with the respondent were well known to those investigating the case. There is, in addition, not the slightest evidence to suggest that Biro entered the shop or picked up the envelope with the intent of finding tangible evidence bearing on an illicit gambling operation, much less any suggestion that he entered the shop and searched with the intent of finding a willing and knowledgeable witness to testify against respondent. Application of the exclusionary rule in this situation could not have the slightest deterrent effect on the behavior of an officer such as Biro. The cost of permanently silencing Hennessey is too great for an evenhanded system of law enforcement to bear in order to secure such a speculative and very likely negligible deterrent effect.

Id. at 279-80.

Reviewing Ceccolini's holding regarding application of the attenuation doctrine to witness testimony, the Third Circuit summarized:

> the factors to be considered include the following: whether the unlawful intrusion led directly to the testimony in question; the length of time between the unlawful intrusion and discovery of the challenged testimony; whether the witness was himself a suspect; the degree of free will exercised by the witness; and the time, place and manner of the initial questioning of the witness.

United States v. Schaefer, 691 F.2d 639, 644-45 (3d Cir. 1982).

Ceccolini requires denial of McAleese's motion with regard to the witness testimony. The situation is almost identical. When the local detective sought a warrant to search McAleese's phone, he was indisputably searching for evidence of a murder, committed by blunt force trauma, not federal firearms violations. Nor was the detective seeking to identify any witness regarding firearms offenses. Indeed, the authorities did not follow up on the lead from the phone regarding Lock's for four months, exactly the lengthy duration of time that passed in Ceccolini before an interview of the witness. The witnesses who were then identified at Lock's

9

were not themselves suspects in any wrongdoing, and responded to the law enforcement inquiry of their own free will. The seized phone was not used in questioning them at all. Further, the questioning took place without coercion, at their place of employment.

In these circumstances, the exclusionary rule may not be applied. Finding the witnesses may have been a "but for" product of the search of the cell phone, but Ceccolini holds that their willingness to testify at a much later date is sufficiently attenuated that the exclusionary rule may not apply. To state it differently, the deterrent impact on the detective -- in impinging the prosecution of offenses which he was not even investigating at the time of the search -- is so scant that the societal cost of exclusion far outweighs any benefit. Ceccolini requires admission of the witness testimony.

Once this result is applied, the records of Lock's are admissible as well. These records preexisted any unlawful police action, and Lock's was required by federal law, as a federal firearms licensee, to retain them. Based on the witnesses' identification of McAleese as a person who patronized the dealer, the authorities inevitably would have required production of the records.

(It may separately be argued that the records are independently admissible under the attenuation doctrine as well. An attenuation question requires assessment of the temporal proximity of the unlawful police action and the recovery of evidence, the presence of intervening circumstances, and "the purpose and flagrancy of the official misconduct." Brown v. Illinois, 422 U.S. 590, 603-04 (1975). Here, while the search of the phone led directly to Lock's, there was a four-month gap, and most importantly, the official misconduct was not flagrant. This Court declined to conclude that the detective intentionally presented false information to the

issuing authority, only that he had reason to know of the mistake. Mem. Op. at 12 ("Although we do not find that Quinn included the false information with the malicious purpose of deceiving the issuing judge, given the facts at his disposal at the time he prepared the affidavit, we are left with no other choice than to conclude that he at least had 'obvious reasons to doubt the truth of what he was asserting.'"). Given that the detective was not investigating a firearms offense at all, it is apparent that he did not act purposefully or flagrantly to unlawfully obtain evidence of firearms violations located in records which the law mandated be kept by a licensee. See, e.g., United States v. Awadallah, 349 F.3d 42, 75 (2d Cir. 2003) (where the government's motivation was to investigate terrorist attacks, not make a case for perjury against an interviewee, there was an insufficient deterrent effect to permit suppression in a perjury prosecution of statements made after the allegedly improper detention of the witness).)

For these reasons, even upon finding a Fourth Amendment violation in the search of the phone, application of the exclusionary rule is inappropriate. On reconsideration, the defendant's motion to suppress should be denied.

Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney


s/ Robert A. Zauzmer
ROBERT A. ZAUZMER
Assistant United States Attorney
Chief of Appeals


s/ Eric B. Henson
ERIC B. HENSON
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

      I certify that on this day I caused a copy of the Government's Motion for Reconsideration of Court's Order Granting Defendant's Motions to Suppress to be served by electronic filing to:

        James J. McHugh, Jr., Esquire
        Defender Association, Federal Division

        s/ Eric B. Henson
        ERIC B. HENSON
        Assistant United States Attorney

Date:  July 30, 2013.