IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| v. | : | CRIMINAL NO. 12-239-1 |
| | : | |
| | : | |
| FRANK G. MCALEESE | : | |

### DEFENDANT'S RESPONSE TO
### THE GOVERNMENT'S MOTION FOR RECONSIDERATION
### OF COURT'S ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS

The government has filed a Motion for Reconsideration of this Court's order of July 11, 2013, granting Defendant's Motion to Suppress. The government concedes, for purposes of this reconsideration motion, that the search of defendant's cell phone was improper but nonetheless asserts that this Court's order granting suppression constitutes "clear error" and a "manifest injustice" in that "[t]he evidence at issue – the testimony of the employees of Lock's, a federal firearms licensee, and the records of Lock's – is sufficiently attenuated from the illegality identified by the Court that the exclusionary rule should not apply to this evidence." (Gov. Recon. Mot. at 1). Specifically, the government claims that United States v. Ceccolini, 435 U.S. 268 (1978), is "on point" and requires the "denial of the motion to suppress in this case." (Id.).

The government's argument is both legally and factually meritless. The Supreme Court's Ceccolini decision – handed down three months *before* the Supreme Court's decision in Franks v. Delaware, 438 U.S. 154 (1978) – does not in anyway compel reconsideration of this Court's order granting suppression. This Court's order granting suppression was in complete compliance with the Fourth Amendment and the holding in Franks. It is far from "clear error," does not

constitute a "manifest injustice," and should not be reconsidered. For the following reasons, the government's motion for reconsideration should be denied.

**I.  THIS COURT'S SUPPRESSION RULING WAS BASED ON CLEAR AND CORRECT FINDINGS OF FACT AND A PROPER APPLICATION OF THE LAW AND IT WAS NOT CLEARLY ERRONEOUS AND IT DID NOT CONSTITUTE A MANIFEST INJUSTICE**

This Court granted Mr. McAleese's motion to suppress after a thorough and complete hearing and after both sides submitted post-hearing briefs. In a detailed twenty page Memorandum Opinion filed on July 11, 2013, this Court relying primarily on <u>Franks v. Delaware</u>, 438 U.S. 154 (1978), ruled that Mr. McAleese's Fourth Amendment rights were violated when the police searched his Cricket cellular telephone "pursuant to a warrant based upon an affidavit containing a material falsehood made with reckless disregard for its veracity." (Memo Opin. at 20). The decision granting suppression was, in all respects, based on sound findings of fact supported by the evidentiary record and correct legal conclusions.

**A.  This Court Correctly Found that Detective Quinn Knowingly Included and Swore to False Information in the Affidavit of Probable cause in Support of the Search Warrant for the Cell Phone**

This Court found that "in the affidavit to support probable cause Detective Quinn stated that the Cricket was recovered from Brown's Hyundai. This fact was false. The phone was found inside McAleese's Ford Taurus during the search of that vehicle. Indeed the evidence ledgers confirm that the Cricket was located in McAleese's Ford . . . ." (Memo Opin. at 11). Furthermore, this Court found that "[t]he evidence available to Quinn when he prepared the affidavit *unequivocally* reflected that the Cricket cell phone was found inside McAleese's vehicle, the Ford Taurus." (Memo Opin. at 12) (emphasis added.).

2

This Court also found that: "Although we do not find that Quinn included the false information with the malicious purpose of deceiving the issuing judge, given the facts at his disposal at the time he prepared the affidavit, we are left with no other choice than to conclude that he at least had obvious reasons to doubt the truth of what he was asserting." (Memo Opin. at 12). This finding led this Court to conclude that "there was *no basis* for Detective Quinn to believe the statement he swore to in his affidavit was true, and every reason for him to know it was false." (Id. at 12-13) (emphasis added).

### B. This Court Correctly Found that the False Information was Material to a Finding of Probable Cause

The government argued that the false information was nothing more than a typo. (Memo Opin. at 13). However, this Court disagreed explaining that the false information was "particularly important as it described the location of where the item to be searched had originally been recovered." (Id.). However, this Court recognized that "[t]he inclusion of false information in an affidavit does not necessarily render a warrant based upon that affidavit invalid." (Memo Opin. at 11). Applying the "materiality standard," (Memo Opin. at 14), this Court concluded:

> The government has not explained how, with the false material set to one side, the corrected affidavit provides probable cause for a search of the contacts stored on the phone's memory, which ultimately led the police to Lock's . . . We therefore conclude that the falsity contained in the affidavit is material, and the corrected affidavit fails to establish probable cause to search the stored memory of the Cricket cell phone. As such, McAleese has met all of the elements for a successful Franks challenge, and the fruits of the search of the memory of the Cricket cell phone must be suppressed.

(Memo Opin. at 15-16).

### C. This Court Correctly Found that Lock's Evidence was a Fruit of the Illegal Conduct

As to the fruits analysis, this Court noted that "the exclusionary rule require[d] [it] to consider whether the evidence challenged by McAleese 'has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' (citation omitted)." (Memo Opin. at 16). As such, this Court found:

> McDermott stated that his "visit to Lock's Gun Exchange came about after" his search of McAleese's cell phone, that the "only reason" he visited Lock's was because the store's phone number was recovered from McAleese's phone, and that "no other piece of evidence . . . indicated anything about the Lock's gun shop."

(Memo Opin. at 16). This Court then concluded "that Detective McDermott's testimony establishes a direct link between the unlawful search of McAleese's phone and the evidence obtained at Lock's." (Id. at 17).

### D. This Court Correctly Found that the Attenuation Doctrine was Inapplicable to the Facts of this Case

After finding that a direct link existed between the unlawful search of Mr. McAleese's phone and the evidence obtained at Lock's, (Memo Opin. at 17), this Court specifically considered the attenuation doctrine (raised by the government again on reconsideration) and found it inapplicable to the facts of this case. "Even where such a link exists . . . attenuation doctrines may apply to permit admission of the later-discovered evidence." (Id.).

This Court then held: "[h]ere, the government argues that the connection between the search of McAleese's cell phone and the evidence obtained at Lock's is too attenuated to justify suppression. We disagree." (Memo Opin. at 17). In suppressing the eyewitness identifications at Lock's this Court again noted that the situation presented by the facts of this case establish that

4

"the identity evidence was obtained as a direct result of the unlawful search." (Id. at 19).  This Court explained:

> As Detective McDermott testified, had the police not searched the memory of McAleese's cell phone, they would not have ever known of Lock's, visited that location or spoken to the store's employees as part of their investigation . . . These witnesses were not known to the police prior to the unlawful search, and their cooperation would not have been secured without it.  Were these employees permitted to testify, their presence in court would be directly attributable to a Fourth Amendment violation.  Such testimony is therefore tainted and must be suppressed.

(Id.).

## II. THE GOVERNMENT'S RECONSIDERATION MOTION IS MERITLESS AND SHOULD BE DENIED

The government concedes for purposes of the reconsideration motion "that the search of McAleese's cell phone was unlawful, based on [this Court's] finding of an absence of probable cause in the warrant." (Gov. Recon. Motion at 3).  Nevertheless, the government asks this Court to reconsider its above findings, and rule that even where the police, in reckless disregard for the truth, make material misrepresentations in a probable cause affidavit to obtain a search warrant, they should still be permitted to reap the fruits, so long as those fruits can be translated into the form of live witness testimony.

The government's argument is based solely on U.S. v. Ceccolini, supra, where the Supreme Court noted that "the exclusionary rule should be invoked with much greater reluctance where the claim is based on a causal relationship between a constitutional violation and the discovery of a live witness than when a similar claim is advanced to support the suppression of an inanimate object." 435 U.S. at 280.  The Supreme Courts decision in Ceccolini is of no help

to the government. There are obvious and material differences between the facts in the instant case and those found in Ceccolini.

First and foremost, Franks v. Delaware, was decided three months after Ceccolini. Franks dealt with material misrepresentations in a search warrant – exactly like the facts of the instant case and unlike Ceccolini. Ceccolini did not involve a search warrant, let alone a search warrant like the one in the instant case that contained material falsehoods made in reckless disregard for the truth. Nor did Ceccolini involve illegal conduct by the police that was found (as was found by this Court in this case) to be extensive and knowingly false.

Second, the illegal conduct in Ceccolini involved the very brief examination of the contents of an open envelope that was sitting on the counter of a flower shop that was open to the public. Furthermore, that flower shop was the focus of a previous and a subsequent criminal investigation. In the present case there was an extensive search of a private citizen's cell phone that was inside a vehicle miles from the alleged crime scene. As this Court described, it was "a complete inventory of all data contained on the cellular phone, including every contact stored in its memory." (Mem. Opin. at 15). And as for the location of the phone, this Court held "the truth was that the cell phone was actually found in an entirely different vehicle that contained no evidence of an assault, and which was parked some distance from the bar Brown was purportedly driving to." (Id. at 13).

Third, the witness' identity in Ceccolini and her relationship to the defendant were well known by the police *prior to* the illegal police conduct. Specifically, the Ceccolini Court recognized that "both the identity of Hennessey and her relationship with the respondent were well known to those investigating the case." 435 U.S. at 279. Not the case here. The identities

of the Lock's witnesses were completely unknown to the police and divulged solely as a result of the illegal search of the cell phone and the recovery of the Lock's phone number. Additionally, there is no evidence suggesting that a source independent of the illegal search would have revealed their identities. Simply put, the police here – unlike in Ceccolini – had zero evidence pointing them to the Lock's witnesses other than the phone number recovered from the cell phone as a result of the illegal search. Compare United States v. Schaefer, 691 F.2d 639, 645 (3d Cir. 1982) (noting police did not learn witnesses' identities from illegal search and "would have questioned" them regardless of the search).

In this case, the government has not proffered any evidence that the identities of the Lock's employees could have been discovered absent the illegal search of Mr. McAleese's cell phone. See Ramirez-Sandoval, 872 F.2d at 1397 (noting that authorities "would have never discovered" identity of witnesses except for illegal search). As this Court observed:

> . . . had the police not searched the memory of McAleese's cell phone, they would not have ever known of Lock's, visited that location or spoken to the store's employees as part of their investigation . . . These witnesses were not known to the police prior to the unlawful search, and their cooperation would not have been secured without it.

(Memo Opin. at 19).

The government's ability to uncover Lock's and its employees was intrinsically related to the illegal search of Mr. McAleese's cell phone; and, as contrasted with the situation in Ceccolini, the government did not have an ongoing, independent investigation of federal firearm violations before the cell phone was searched.

Fourth, when the officer in Ceccolini went to the flower shop and picked up the envelope, it was not with the intent to find evidence of criminal activity. Indeed, he was just conversing

7

with a friend/employee of the shop while taking a break. This fact was critical to the Ceccolini Court's holding: "There is . . . not the slightest evidence to suggest the Biro entered the shop or picked up the envelope with the intent of finding tangible evidence bearing on an illicit gambling operation, much less any suggestion that he entered the shop and searched with the intent of finding a willing and knowledgeable witness to testify against respondent." 435 U.S. at 280. Based on these factors, the Ceccolini Court reversed the suppression order finding that "[a]pplication of the exclusionary rule . . . could not have the slightest deterrent effect . . ." and "[t]he cost of . . . silencing [the witness] is too great . . . ." Id. The Supreme Court stated that the analysis might have been different had the police intended to discover "potential witnesses." Id. at 276, n.4.

There is no question that in the instant case, the detectives prepared the affidavit of probable cause and swore to its accuracy, and applied for the search warrant and then went to the gun shop to investigate a crime and to find witnesses against McAleese. Indeed, their intent was to find witnesses who could identify Mr. McAleese from a photograph they had obtained from the search of Mr. McAleese's car and to gather information relating to illegal firearm purchases by Mr. McAleese. This is a critical distinction that is ignored by the government. The flagrant police misconduct in this case – unlike the unintentional and non-investigative behavior in Ceccolini – is the very type of misconduct that would respond to and could be deterred by applying the exclusionary rule. Whereas in Ceccolini, the impulsive, almost inadvertent search was of a type not likely to be affected by prior consideration of the consequences.

As the government correctly noted in its motion to reconsider, when Detective Quinn "sought a warrant to search McAleese's cell phone, he was indisputably searching for evidence . .

8

. ." (Gov. Recon. Mot. at 9). While the government alleges that it was for "evidence of a murder," as opposed to "federal firearms violations," (id.), the fact remains that less than 24 hours after interviewing the employees and obtaining ATF 4473 forms, the police contacted the ATF and explained what they had learned as a result of their visit to Lock's.

Furthermore, in assessing the "purpose" of the illegal action, the most important consideration in [the attenuation] analysis is the "flagrancy of the official misconduct." Brown v. Illinois, 422 U.S. 590, 603-04 (1975); see also United States v. Roberts, No. 11-cr-0018, 2012 WL 1033515, *7 (E.D. Pa. 2012) (in attenuation analysis, most important consideration is "the purpose and flagrancy of the official misconduct"). Indeed, courts have invariably refused to apply the attenuation doctrine to evidence obtained as the result of a serious Fourth Amendment violation. See, e.g., United States v. Rivera-Padilla, 365 Fed. App'x 343, 347 (3d Cir. 2010) (no attenuation, because misconduct "was serious indeed"); Roberts, supra, (no attenuation, because officer's fabrication of story to justify illegal search was "egregious"); United States v. Robeles-Ortega, 348 F.3d 679, 684-85 (7th Cir. 2003) (no attenuation, because the purpose of the stop seemed to be "investigatory"); United States v. Fox, 600 F.3d 1253, 1262 (10th Cir. 2010) (no attenuation, because officer embarked on fishing expedition).

The Fourth Amendment violation here was egregious. As the Court observed, Detective Quinn, with reckless disregard for the truth, obtained a warrant to search Mr. McAleese's cell phone based upon an affidavit containing a material falsehood he had obvious reasons to know was untrue. Detective Quinn's conduct set in motion a chain of events that ultimately ended with Mr. McAleese being indicted federally.

Application of the exclusionary rule in this case would have a tremendous deterrent effect

on the police. That was not the case in <u>Ceccolini</u> where "[a]pplication of the exclusionary rule in this situation could not have the slightest deterrent effect on the behavior of an officer such as Biro." 435 U.S. at 280. Thus, contrary to the government's assertion that the deterrent impact is "so scant that the societal cost of exclusion far outweighs any benefit," (Gov. Recon. Motion at 10), the suppression remedy serves a sufficient deterrent function under the circumstances of this case to justify its social cost. Here, the police would quite obviously – and appropriately – be deterred from conducting any future unlawful searches by suppressing the evidence in this case. Detective Quinn acted unreasonably, and in contravention of clear law, by including false information in a probable cause affidavit that he had "'obvious reasons to doubt the truth of what he was asserting.'" (Memo Opin. at 12) (citation omitted ). As the Court noted, his actions may not have been "malicious," (<u>id.</u>), but they were definitely reckless, and therefore clearly deterrable.

  The <u>Ceccolini</u> Court also noted that the evidence overwhelmingly indicated that the testimony of the witness (Hennessey) was given of her own free will, and was in no way coerced or induced by official authority as a result of the discovery of the policy slips. Nor were the slips themselves used in questioning Hennessey. Specifically in <u>Ceccolini</u>, "[t]he evidence indicated] overwhelmingly that the testimony given by the witness was an act of her own free will in no way coerced or even induced by official authority as a result of Biro's discovery of the policy slips." 435 U.S. at 279.

  Here, the record leads to the opposite conclusion. It cannot be said that the Lock's employees' initial identifications were made of their own free will over which the government's action played no part. While the government asserts that the employees of Lock's "responded to

10

the law enforcement inquiry of their own free will," (Gov. Recon. Mot. at 10). This argument is not supported by the record.

The Lock's employees "willingness" to talk to and cooperate with the government occurred after Detective McDermott advised them that he was investigating a murder and that the phone number for Lock's was saved in the alleged murderer's cell phone. So, while the government claims that the employees of "Lock's were not themselves suspects in any wrongdoing," (Gov. Recon. Mot. at 10), the record reflects that Virginia Lock, the owner of Lock's, believed otherwise and possibly felt pressure to cooperate. Clearly aware of her own precarious legal situation upon learning the reason for Detective McDermott's visit to Lock's, Virginia Lock testified that although she didn't remember if she asked Detective McDermott if Mr. McAleese had done it with one of her guns, that was something she was concerned about. (See Transcript of Motion Hearing, 01/24/2013 ("Tr."), 51:4-9).

In Ceccolini, the Supreme Court noted that the policy slips, which Biro had noticed during the illegal search of the envelope, were not used in questioning the witness. 435 U.S. at 279. See United States v. Ramirez-Sandoval, 872 F.2d 1392, 1397 (9th Cir. 1989) (noting that "illegally obtained documentary evidence was clearly used" in questioning witness).

When asked at the suppression hearing whether he ever told the employees at Lock's his reason for coming there, Detective McDermott testified that he told the employees of Lock's that he was "a homicide detective" and "that it actually was a homicide that we were investigating." (Tr. 103:23-25; 104:1-6). He further testified that:

> I think I might have mentioned to Mrs. Lock that [Mr. McAleese] had actually had the phone number [for Lock's] saved in his phone and that's what brought me there.

11

(Tr. 103:14-23). Thus, the information regarding Lock's that was acquired from the memory of Mr. McAleese's cell phone was used during the interviews/identifications of the employees of Lock's.

Finally, the government claims that "the authorities did not follow up on the lead from the phone regarding Lock's for four months, exactly the lengthy duration of time that passed in Ceccolini before an interview of the witness." (Gov. Recon. Mot. at 9). The four month time frame in both Ceccolini and in this case must be viewed in light of the illegal conduct present in each case. As discussed above, the illegal conduct in Ceccolini pales in comparison to the egregious conduct here. The fact that in both cases the follow up investigations took place four months after the illegal conduct is therefore a similarity that is of no relevance.

Given all of these obvious, significant, and numerous differences, the Supreme Court's decision in Ceccolini is far from "on point," (Gov. Recon. Mot. at 1), and this Court's decision suppressing the evidence was absolutely appropriate and should not be vacated.

### III. CONCLUSION

The Supreme Court's decision in Ceccolini does not stand for the proposition that the exclusionary rule does not apply to the testimony of live witnesses derived from the type of Fourth Amendment violation that occurred in this case. In fact, this case is a clear example of why the Supreme Court "reject[ed] the Government's suggestion that [they] adopt what would in practice amount to a per se rule that the testimony of a live witness should not be excluded [from] trial . . . ." 435 U.S. at 274. The illegal search of Mr. McAleese's cell phone was the *only* event that led to the discovery of Lock's, the identifications and testimony of the Lock's

employees and the firearm transaction records kept by Lock's. This evidence, therefore, was not derived "by means sufficiently distinguishable to be purged of the primary taint." Wong sun v. United States, 371 U.S. 471, 488 (1963). For the foregoing reasons, this Court's ruling suppressing the evidence in this case was in accordance with the legal principles set forth in Franks v. Delaware, 438 U.S. 154 (1978) and should not be vacated.

        Respectfully submitted,

        */s/ James J. McHugh, Jr.*
        JAMES J. MCHUGH, JR.
        Assistant Federal Defender

# CERTIFICATE OF SERVICE

      I, James J. McHugh, Jr., Assistant Federal Defender, Federal Community Defender Office for the Eastern District of Pennsylvania, hereby certify that I have served a true and correct copy of Defendant's Response to the Government's Motion for Reconsideration of Court's Order Granting Defendant's Motion to Suppress upon Eric B. Henson, Assistant United States Attorney, by Electronic Case Filing and hand delivery to his office at the United States Attorney's Office located at 615 Chestnut Street, Suite 1250, Philadelphia, Pennsylvania 19106, on the date indicated below.

                                                */s/ James J. McHugh, Jr.*
                                                JAMES J. MCHUGH, JR.
                                                Assistant Federal Defender

DATE:  August 20, 2013