# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff, | : | CRIMINAL ACTION |
| | : | |
| v. | : | No. 12-239-1 |
| | : | |
| FRANK MCALEESE,<br>    Defendant. | : | |
| | : | |

**Goldberg, J.**                                                                                          September 30, 2013

## MEMORANDUM OPINION

We previously held that witness identification testimony, along with records of firearms purchases, were the fruits of an unlawful search of Defendant Frank McAleese's cell phone, and accordingly, suppressed this evidence. (Mem. Op., July 10, 2013, Doc. No. 37.) The government has filed a motion for reconsideration of that ruling, relying almost entirely upon United States v. Ceccolini, 435 U.S. 268 (1978). This motion does not ask that we reconsider our conclusion that the search violated the Fourth Amendment and indeed the government seems to "accept[ ]" this finding. (Gov't Br. at 3.) Rather, the government now urges that Ceccolini, a case not previously mentioned by the government, is "on point," and requires us to reverse our decision and find that both the records and the witness testimony are so attenuated from the illegal search as to salvage their admissibility.

For reasons explained below, having carefully considered Ceccolini, we remain convinced that our July 10, 2013 decision was correct.

## I. Factual and Procedural Background

The facts of this case were presented in detail in our earlier opinion, and need not be repeated at length here. Briefly, Defendant is charged with offenses related to several alleged firearms purchases and sales which took place at Lock's Philadelphia Gun Exchange ("Lock's"). The government asserts that Defendant used identification issued in a different name, and falsely certified on firearms purchase forms that he had never been convicted of a felony. As evidence of these charges, the government obtained the transaction records and witness identification testimony from Lock's. This evidence was discovered after a search through the "contacts" in Defendant's cell phone, one of which was Lock's. It was the search of the cell phone that we found to be unlawful, because it was based upon a warrant that contained a material falsehood made with reckless disregard for its truth. (Mem. Op. at 13.) Specifically, the affidavit in support of the warrant stated that the cell phone was recovered from a Hyundai where Defendant's girlfriend had been assaulted, when in fact it had been recovered from Defendant's Ford, which contained no evidence of an assault.

## II. Discussion

"The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence." Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1985). Such motions are appropriate where the moving party can demonstrate: (1) the availability of new evidence not previously available; (2) an intervening change in controlling law; or (3) the need to correct a clear error of law or to prevent manifest injustice. Watson v. City of Philadelphia, 2006 WL 2818452, at *2 (E.D.Pa Sept. 28, 2006).

Here, the government asserts that reconsideration is necessary to correct a clear error of law in that the Court's ruling is contrary to the Supreme Court's decision in Ceccolini.

Defendant responds that the circumstances addressed in that case are factually distinct from those at issue here, and that precedent since Ceccolini indicates that suppression was appropriate.

Before turning to the distinctions between this case and Ceccolini, we note that the Supreme Court decided Ceccolini prior to its ruling in United States v. Crews, 445 U.S. 463 (1980), which we relied upon to support our finding that the testimony of Lock's employees was fruit of the unlawful search.[1] In Crews, the Supreme Court specifically contemplated the application of the exclusionary rule to live testimony where "the witness' identity was discovered or her cooperation secured only as a result of an unlawful search or arrest of the accused." Id. at 471-72. We view the reasoning in Crews to be entirely consistent with the Supreme Court's previous analysis in Ceccolini and find that both cases support the application of the exclusionary rule in this case.

In Ceccolini, a police officer entered a flower shop for the purpose of conversing with his friend, who was employed as a cashier. 435 U.S. at 269-70. During their conversation, the officer observed an envelope lying on the cash register and, without the cashier noticing, looked inside. Id. at 270. There, the officer found money and "policy slips," which he knew to be indicative of gambling. Id. The officer then asked his friend whether she knew who owned the envelope, and she responded that it belonged to Ceccolini, the owner of the store. Id. This incident prompted the FBI, who had previously surveilled Ceccolini's shop, to interview the cashier about four months later. Id. After Ceccolini denied any involvement in gambling, he was charged and convicted of perjury, largely on the strength of the cashier's testimony. Id. Following the verdict, the district court granted a defense motion to suppress the cashier's testimony as a fruit of the

---

[1] Ceccolini was also decided prior to Franks v. Delaware, 438 U.S. 154 (1978), which this Court relied upon in finding that the search of McAleese's cell phone was unlawful. However, Franks concerned the lawfulness of a search conducted pursuant to a warrant based on a false affidavit, and is of little guidance on the issue of whether a witness's testimony is too attenuated to justify application of the exclusionary rule.

3

officer's illegal search of the envelope, and set aside the conviction. Id. The Second Circuit affirmed, concluding that "the road to [the cashier's] testimony from [the officer's] concededly unconstitutional search is both straight and uninterrupted." United States v. Ceccolini, 542 F.2d 136, 142 (2d Cir. 1976).

The Supreme Court reversed, concluding that the testimony was too attenuated from the unlawful search to justify application of the exclusionary rule. While reaffirming the principle that "verbal evidence which derives so immediately from [a constitutional violation] is no less the 'fruit' of an official illegality than the more common tangible fruits," the Court held that "since the cost of excluding live-witness testimony often will be greater, a closer, more direct link between the illegality and that kind of testimony is required." Ceccolini, 435 U.S. at 275, 78 (quoting Wong Sun v. United States, 371 U.S. 471, 486 (1963)). The court instructed that among the factors that must be considered in deciding whether to suppress live witness testimony are the closeness and directness of the link between the illegality and the testimony, whether the witness was known to the police for reasons other than the search, whether the search was conducted specifically for the purpose of identifying potential witnesses, and the willingness of the witness to testify. Id. at 275-80; see also United States v. Schaefer, 691 F.2d 639, 644 (3d Cir. 1982).

In finding that these factors weighed against excluding the cashier's testimony, the Supreme Court specifically noted that "[s]ubstantial periods of time elapsed" between the search, the initial contact of the witness, and the trial; that "both the identity of [the cashier] and her relationship with the [defendant] were well known" to police prior to the search; and that there was "not the slightest evidence to suggest that [the officer] entered the shop or picked up the envelope with the intent of finding tangible evidence bearing on" the defendant's criminal

activity. Id., at 280-81. Ultimately, the Supreme Court determined that the exclusionary rule should not apply because it "could not have the slightest deterrent effect on the behavior" of the police. Id.

For several reasons, we conclude that the factors identified in Ceccolini weigh in favor of application of the exclusionary rule in this case.

First, the identity evidence at issue was obtained as a direct result of the unlawful search of Defendant's phone. (Mem. Op. at 19.) The line between the illegality and the discovery of that evidence could not be more direct. Detective McDermott testified that the recovery of Lock's contact information from Defendant's phone was the "only reason" for his visit there, and that no other evidence in his investigation revealed any connection to Lock's. (N.T. 1/24/13, at 104.) Thus, the "closer, more direct link between the illegality and [the] testimony" that Ceccolini requires is present here.

Second, far from this being a case in which the identity of the witnesses and their relationship to the defendant were known to the police prior to the illegal search, here, it was the illegal search alone that allowed law enforcement to obtain the Lock's witnesses' identities. Indeed, the government's own witness verified that "[N]o other piece of evidence . . . indicated anything about the Lock's gun shop." (N.T. 1/24/13, at 104.) This factor falls squarely within the Supreme Court's acknowledgment that, although courts should be more reluctant to suppress live witness testimony than tangible evidence, "the analysis might be different where the search was conducted by the police for the specific purpose of discovering potential witnesses." Ceccolini, 435 U.S. at 276 n.4. That was exactly the case here, where the search of Defendant's cell phone was conducted for the specific purpose of finding evidence bearing on McAleese's criminal activity, and the government would not have known the identities of the witnesses without the

search.[2] (See N.T. 1/24/13, at 99 ("I knew very little about [Defendant], very little background information and it was more or less a general canvas at that point, any contacts.")). Circuit courts applying Ceccolini have been uniform in considering this factor to be of paramount importance. See, e.g., United States v. Ramirez-Sandoval, 872 F.2d 1392, 1397 (9th Cir. 1989) (suppressing witness testimony and noting that "the identities of the witnesses were not known to those investigating the case" prior to the illegal search); Schaefer, 691 F.2d at 645 (refusing to suppress evidence where "[t]he officer did not learn of the identity of any witness as a result of the unlawful search, and would have questioned these individuals irrespective of the search"); United States v. Scios, 590 F.2d 956, 963 (D.C. Cir. 1978) (suppressing witness testimony where individual's existence as a potential witness was entirely unknown to the authorities before they searched [the defendant's] files," witness testified under threat of contempt, and the illegal "search . . . was to gain evidence").

The government stresses that the Lock's witnesses are willing to testify, and in fact provided testimony at the evidentiary hearing on the motion to suppress. (N.T. 1/24/13, at 39-95.) The government concludes that the witnesses' "willingness to testify at a much later date" establishes attenuation, and mandates admission of the testimony. (Gov't Br. at 10.) Ceccolini does not stand for this proposition and application of the government's theory would come close to establishing a per se rule against the exclusion of live witness testimony. Even Chief Justice

---

[2] The government has never denied that the purpose of the search was to find evidence of criminal activity by McAleese, nor could it. The officers who visited Lock's were investigating McAleese in connection with the death of his girlfriend, Carole Brown, and obtained an (invalid) warrant authorizing them to search the phone for evidence related to her death or to controlled substances violations. (Nov. 15, 2011 Warrant, 1/24/13 Hrng. Ex. 8, at 1-2.) The clear purpose of copying the contacts from McAleese's phone and investigating the identity of those contacts was to find potential witnesses. (N.T. 1/24/13, at 98-100 (phone's memory used to identify contacts for a canvas).) This is confirmed by the fact that, after the police recovered contact information for Lock's, they visited the store with photographs of McAleese and questioned the store's employees. (N.T. 1/24/13, at 98-100.)

6

Burger, who would have established the per se rule against suppression of live witness testimony that the government seems to favor, might have been willing to entertain an exception for a case such as the one before us, "in which the police conducted a search only for the purpose of obtaining the names of witnesses." Ceccolini, 435 U.S. at 284 n.4 (Burger, C.J., concurring). Chief Justice Burger recognized that, "it is possibly arguable that the exclusion of any testimony gained as a result of the search would have an effect on official behavior." Id.

In short, if all that mattered was a witness's later willingness to testify, then there would have been no reason for the Supreme Court to have considered the closeness of the connection between the illegal conduct of the police and the witness. The voluntariness of the testimony is only relevant because "[t]he greater the willingness of the witness to freely testify, the greater the likelihood that he or she will be discovered by legal means and, concomitantly, the smaller the incentive to conduct an illegal search to discover the witness." Ceccolini, 435 U.S. at 276. This logic does not apply here because it is entirely improbable that the Lock's witnesses would have "come forward and offer[ed] evidence entirely of their own volition" absent the illegal search. Ceccolini, 435 U.S. at 276. Indeed, there is no indication that, prior to the police visit, Lock's employees were even aware of McAleese's true identity or alleged gun crimes.

The government also considers it important that "[w]hen the local detective sought a warrant to search McAleese's phone, he was indisputably searching for evidence of a murder, committed by blunt force trauma, not federal firearms violations." (Gov't Br. at 9.) Thus, the government concludes that suppression of evidence in a federal firearm's case would have no additional deterrent effect on police officers investigating a homicide. We do not view this distinction as relevant to the deterrent effect of suppression in this case. The police were conducting a "general canvas" for information about McAleese's criminal activity, in which the

cell phone contacts played an important role. In other words, although the murder prompted the investigation, the scope of the search was broad, and extended to "background information." (N.T. 1/24/13, at 99.) Witnesses with a connection to Defendant and with knowledge of his conduct were not something police happened upon in the course of their search: they were the object of the search through Defendant's cell phone contacts. Accordingly, this is not a case in which suppression would have only a marginal deterrent effect. See United States v. Awadallah, 349 F.3d 42 (2d Cir. 2003) (holding evidence illegally obtained during terrorism investigation could be used in subsequent perjury prosecution).

The government also points to the four month gap between the illegal search of the phone and the visit to Lock's to support its attenuation argument. Cf. Ceccolini, 435 U.S. at 279 (noting in support of attenuation that "[s]ubstantial periods of time elapsed between the time of the illegal search and the initial contact with the witness"). We do not view the time between the search of the phone and the visit to Lock's to be a valid reason to reverse our original decision. There is no indication from the record that the time lapse was due to anything other than a lack of relevant leads and the time it took to review an entire cell phone's worth of information. Police "recorded . . . every other stored contact within the phone," and still had "very little background information" about McAleese prior to the visit to Lock's. (N.T. 1/24/13, at 98.) While a long time between the illegality and the initial contact with a witness could, in some cases, indicate that the illegality played only a minor role in obtaining the helpful testimony, that logic does not apply here, where the police candidly admitted that it was the cell phone—and only the cell phone—that led them to the witnesses. Had the time between the illegal search and the Lock's visit been even longer, that would not have changed the fact that the illegal search was the only link to the evidence in question.

Finally, the government also asks us to reconsider our holding as to the transaction records, on the grounds that the "records preexisted any unlawful police action, and Lock's was required by federal law, as a federal firearms licensee, to retain them." This is not enough on its own to justify admitting records obtained through a Fourth Amendment violation. In any event, the theory underlying the government's argument seems to be that, where a witness's testimony is sufficiently attenuated to be admissible, documents under the control of that witness are likewise admissible. We need not decide whether that theory might hold water in an appropriate case, because we have concluded that the witness testimony must be suppressed, and thus the records, which flowed just as directly from the illegal search of the phone, must be suppressed as well.

We fully recognize that the exclusionary rule should be viewed as a last resort and applies "only where it 'result[s] in appreciable deterrence'" Herring v. United States, 555 U.S. 135, 141 (2009) (quoting United States v. Leon, 468 U.S. 897, 909 (1984)). That condition is satisfied here. Police candidly admitted that the search of Defendant's cell phone, which we concluded was illegal, was the only connection they found to Lock's. There is no basis to believe that the Lock's witnesses would have come forward themselves absent the police illegality. The misinformation contained in the affidavit was also significant as it revolved around the location of the item searched. Police advised the issuing judge that the cell phone was inside a vehicle that contained significant evidence of a brutal assault when, in fact, the phone was nowhere near that crime scene. Suppression of evidence under these unique circumstances should incentivize law enforcement to act more carefully in preparing affidavits, as the exclusionary rule is designed to do. Accordingly, the motion for reconsideration is denied.

Our order follows.